NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BAUSCH & LOMB, INC., Respondent.

No. 69, Docket 75–4037.

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1975.

Decided Nov. 25, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel and Michael S. Wolly, Atty., NLRB, Washington, D. C., of counsel), for petitioner.

Gerald L. Paley, Rochester, N. Y. (Nixon, Hargrave, Devans & Doyle, Michael J. Doyle, Rochester, N. Y., of counsel), for respondent.

Before KAUFMAN, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

**J. JOSEPH SMITH, Circuit Judge:**

On October 25, 1974, a three-member panel of the National Labor Relations Board, acting upon the recommendation of Administrative Law Judge Eugene E. Dixon, issued a cease and desist and affirmative action order against Bausch & Lomb, Inc. of Rochester, New York, 214 NLRB ——, pursuant to § 10(c) of the National Labor Relations Act, codified as 29 U.S.C. § 160(c).[1]

---

1. Section 10(c) of the National Labor Relations Act provides in pertinent part:

 If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to

The Board's order in this particular case imposes two major obligations upon Bausch & Lomb. First, Bausch & Lomb is required to bargain with the International Union of Operating Engineers, Local 71–71A, AFL–CIO, as the exclusive representative of certain Bausch & Lomb employees in Rochester, New York. Second, the order requires Bausch & Lomb to offer employment at its North Goodman Street plant in Rochester to three of the union's members who had previously worked in the North Goodman Street building before it had been purchased for Bausch & Lomb.

The Board found that Bausch & Lomb had, by its failure to hire these three union members, violated three provisions of the National Labor Relations Act: § 8(a)(3) which forbids an employer, such as Bausch & Lomb, to refuse to hire workers because of their union membership, § 8(a)(5) which forbids an employer to refuse to bargain with the union that represents his employees, and § 8(a)(1) which forbids an employer to interfere with his employees' right to unionize. 29 U.S.C.A. §§ 158(a)(1), (3) and (5).

The case is presently before this court on the Board's petition for enforcement under § 10(e) of the National Labor Relations Act. 29 U.S.C. § 160(e).[2] In opposition, Bausch & Lomb contends that there is insufficient evidence to support the finding that Bausch & Lomb committed unfair labor practices. In the alternative, Bausch & Lomb contends that, assuming such abuses did occur, the remedy provided in the Board's order is legally inappropriate.

For the reasons stated below, we find that Bausch & Lomb did violate §§ 8(a)(3) and (1) through its refusal to hire certain persons because of their union affiliation. However, we reverse the Board's determination that Bausch & Lomb violated § 8(a)(5). Accordingly, we enforce that part of the Board's order which requires Bausch & Lomb to offer employment and back pay to the three union members which Bausch & Lomb illegally refused to hire. However, we do not enforce the Board's bargaining order.

## I. BACKGROUND

On December 17, 1973, Bausch & Lomb acquired the use of an industrial building located at 1400 North Goodman Street, Rochester, New York. This building had previously belonged to General Dynamics Corporation, a firm which used the North Goodman Street plant for the manufacture of electrical equipment designed for military aircraft. When General Dynamics discontinued its production of this equipment, it began negotiating with Bausch & Lomb for the sale of the North Goodman Street building which, to General Dynamics, had become surplus property. The building was eventually purchased by the New York State Urban Development Corporation for the use of Bausch & Lomb in its business, the manufacture and sale of ophthalmic devices.

When General Dynamics owned the North Goodman Street plant, the boiler room and heating system of the building were run by four persons who belonged to the International Union of Operating Engineers, Local 71–71A, AFL–CIO (hereinafter the Engineers Union). After Bausch & Lomb acquired the building from General Dynamics, only one of these four, Bernard Simpson, chief engineer of the boiler room, was offered employment with Bausch & Lomb. In this capacity, Simpson was to continue his supervision of the boiler and heating sys-

---

be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this [Act].
29 U.S.C. § 160(c).

2. Section 10(e) of the National Labor Relations Act provides in pertinent part:
 The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.
 29 U.S.C. § 160(e).

tem at the North Goodman Street building. All four of General Dynamics' former boiler room employees (including Simpson) now work for employers other than Bausch & Lomb.

Administrative Law Judge Dixon, after a two-day hearing in Rochester on April 30 and May 1, 1974, concluded that Bausch & Lomb's failure to hire the three non-supervisory boiler room employees had violated §§ 8(a)(1), (3) and (5). The crux of Judge Dixon's decision was his finding that Bausch & Lomb refused to hire the three boiler room workers because of their union membership.

A three-member panel of the NLRB affirmed Judge Dixon's factual findings and adopted his recommendations as to the appropriate remedy, to wit, an order against Bausch & Lomb requiring it (1) to bargain with the Engineers Union and (2) to offer the three former boiler room employees an opportunity to return to the positions they had held under General Dynamics at the North Goodman Street building. In connection with this job offer, Bausch & Lomb is required to furnish back pay to the three workers not hired.

## II. THE § 8(a)(3) CHARGE

 Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). It is well established that an employer violates § 8(a)(3) when he refuses to hire an individual because of that individual's union affiliation. *See, e. g., NLRB v. New England Tank Industries, Inc.,* 302 F.2d 273, 275 (1st Cir. 1962); *NLRB v. Foodway of El Paso,* 496 F.2d 117 (5th Cir. 1974). However, the mere failure to hire a union member does not, by itself, violate § 8(a)(3). *Crotona Service Corp.,* 200 NLRB 738 (1972). The requirements of § 8(a)(3) are transgressed only when the employer who refuses to hire is motivated by an anti-union animus. Anti-union intent on the part of the employer is

a necessary element of a § 8(a)(3) violation. If the failure to hire a union member results from legitimate business considerations or is otherwise free of anti-union animus, there is no § 8(a)(3) violation. *NLRB v. George J. Roberts & Sons, Inc.,* 451 F.2d 941 (2d Cir. 1971) at 947.

Thus, Bausch & Lomb's liability under § 8(a)(3) depends, ultimately, on the factual question of the motivation behind Bausch & Lomb's refusal to hire the three non-supervisory boiler room workers, who had run the North Goodman Street heating system for General Dynamics. The Board found, as a matter of fact, that Bausch & Lomb's failure to hire was motivated by opposition to the union to which the three workers belonged. Bausch & Lomb maintains here, as it did in the administrative proceedings below, that its failure to hire was motivated by legitimate business considerations—not anti-union animus—and that, accordingly, no § 8(a)(3) violation occurred.

The finding by Judge Dixon and the NLRB that Bausch & Lomb acted with illegal anti-union motivation rested on four basic facts. First was a statement allegedly made by Ellis Faro, Bausch & Lomb's director of employment and compensation, to boiler room supervisor Simpson to the effect that Simpson's three co-workers at the North Goodman Street boiler room would not be hired because of their union affiliation. This statement, testified to by Simpson, served to establish an explicit anti-union motivation behind the actions of the Bausch & Lomb management.

Second was the fact that the three unionized employees who were not hired had extensive experience and expertise with the North Goodman Street boiler system. The fact that the workers were competent, qualified and experienced and that Bausch & Lomb chose to let them go anyway created an inference of ulterior motive, *i. e.,* anti-union animus, on the part of management.

Third was Bausch & Lomb's decision to hire a temporary consultant to train

its new employees in the operation and maintenance of the North Goodman Street boiler. Since the consultant was hired to train the new boiler room employees, it is logical to infer that Bausch & Lomb deliberately hired or transferred unqualified individuals who needed on-the-job education while it simultaneously refused to hire the three union members who already knew how to run the boiler as a result of their earlier experience under General Dynamics. Bausch & Lomb's decision to utilize inexperienced people in need of training rather than continue the employment of the veteran workers reinforced the inference of ulterior motive, i. e., an intent to keep the Engineers Union out of North Goodman Street.

Finally, the Judge and the NLRB based their finding of anti-union animus upon the fact that Bausch & Lomb failed to give alternative employment to the boiler room employees even though such employment had been promised and even though Bausch & Lomb was hiring other people "off the street" for these alternative positions. The refusal to hire the ex-boilermen in any capacity (Bausch & Lomb's promises notwithstanding) was taken to indicate a firm determination to keep these three unionists out of any employment with Bausch & Lomb.

Bausch & Lomb argues here, as it did below, that this evidence is insufficient to prove the anti-union animus required for a § 8(a)(3) violation. Bausch & Lomb points to Faro's denial of the anti-union comment attributed to him, and to a company policy of internal promotion which dictated that the non-supervisory boilermen be replaced with persons already in the employ of Bausch & Lomb. In addition, Bausch & Lomb maintains that it was the three unionists (rather than the company) who failed to follow through on the alternate Bausch & Lomb job offer.

It is not our task to assess the facts of this case de novo. Rather, we are required to determine if the factual findings of the Judge and Board are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). We conclude that sufficient evidence does exist in this case to support the Board's finding of an anti-union animus.

Judge Dixon credited supervisor Simpson when he testified as to Faro's anti-union comment. "[T]he credibility of a witness is in general a determination to be made by the [Administrative Law Judge] and the Board." NLRB v. Marsellus Vault & Sales, Inc., 431 F.2d 933 (2d Cir. 1970) at 937. Decisions by administrative factfinders as to demeanor and credibility will be overturned by this court only when the evidence to the contrary is overwhelmingly compelling. NLRB v. Warrensburg Board & Paper Corp., 340 F.2d 920 (2d Cir. 1965) at 922. That is not the case here.

The decision to use inexperienced workers in need of training when the seasoned crew of the North Goodman Street boiler room could have been retained justifies an inference of ulterior management motive. Faro's anti-union comment indicated to the Board's satisfaction the nature of that ulterior motive: Bausch & Lomb skipped over more highly qualified men because of their union affiliation.

Thus, the evidence is quite consistent with and supportive of the Judge's finding that Bausch & Lomb's failure to hire the three boilermen was motivated by anti-union sentiments, rather than permissible business considerations.

We affirm the finding that Bausch & Lomb violated § 8(a)(3) by refusing to hire the three boilermen because of their union affiliation and we enforce the Board's order insofar as it requires that these unionists be offered their old jobs and back pay.[3]

---

3. Of course, the back pay award received by the individual boilermen must be reduced by the amount of any income received from alternate employment accepted since Bausch & Lomb took control of the North Goodman Street plant.

## III. THE § 8(a)(1) CHARGE

Section 8(a)(1) of the National Labor Relations Act declares it to be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by § 7 of the Act. 29 U.S.C. § 158(a)(1). Section 7, in turn, guarantees to employees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. Thus, § 8(a)(1), like § 8(a)(3), protects an employee's right to belong to a union without interference from an employer. Section 8(a)(3), however, only applies to anti-union interference manifested in discriminatory hiring policies. Section 8(a)(1), in contrast, is broader in scope and covers anti-union interference in any form.

In short, the coverage of § 8(a)(3) overlaps with that of § 8(a)(1). An employer with discriminatory hiring policies violates not only the specific § 8(a)(3) mandate against anti-union employment practices, but also the broader § 8(a)(1) prohibition against anti-union actions of any form. See, *e. g., Local 833, UAW–AFL–CIO v. NLRB*, 300 F.2d 699, 701 (D.C.Cir.1962); *Allied Industrial Workers, AFL–CIO Local Union No. 289 v. NLRB*, 155 U.S.App.D.C. 112, 476 F.2d 868 (D.C.Cir.1973); *New England Tank, supra* 302 F.2d at 275; *Foodway of El Paso, supra.*

## IV. THE § 8(a)(5) CHARGE

Section 8(a)(5) of the National Labor Relations Act requires an employer "to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). An employer who refuses to bargain with a union representing a majority of his workers commits an "unfair labor practice" and is therefore subject to a bargaining order from the Board.

In the administrative proceeding below, a majority of the NLRB panel held that Bausch & Lomb had violated § 8(a)(5) by refusing to bargain with the International Union of Operating Engineers, Local 71–71A, AFL–CIO, as the representative of the North Goodman Street boilermen. The majority's finding was predicated upon the so-called "successorship" doctrine. As applied here, "successorship" was interpreted to require Bausch & Lomb to bargain with the Engineers Union because General Dynamics had been required to do so when it had owned the North Goodman Street facility.

The four General Dynamics boilermen belonged to the Engineers Union. It is undisputed that the four boilermen had bargained as a unit through the Engineers Union and that General Dynamics had been obligated by § 8(a)(5) to bargain with that union since the union had at that time represented a majority (indeed, all) of the boiler room workers.

When Bausch & Lomb assumed control of the North Goodman Street plant, however, none of the General Dynamics boilermen remained. Three of the four unionists were not offered jobs by Bausch & Lomb. Supervisor Simpson was asked to stay at North Goodman Street, but he declined because of Bausch & Lomb's refusal to hire his three co-workers. Thus, when Bausch & Lomb acquired the North Goodman Street plant, none of the original union members remained at their old boiler room positions. The heating and boiler systems were operated for Bausch & Lomb by a completely new set of workers, none of whom appeared to be members of the Engineers Union. Bausch & Lomb has accordingly refused to bargain with the Engineers Union.

The Board found that Bausch & Lomb was, as a matter of law, obligated to bargain with the Engineers Union and that its refusal to do so violated § 8(a)(5). In the Board's view, Bausch & Lomb is, for the purposes of the National Labor Relations Act, General Dynamics' "successor" at the North Goodman

Street plant. As a result of such "successorship," Bausch & Lomb automatically acquires the duty to bargain which had attached to its predecessor, General Dynamics. Accordingly, the Board's order requires Bausch & Lomb to bargain with the Engineers Union as the representative of the present boiler room workers.

We disagree with the Board that Bausch & Lomb is the "successor" to General Dynamics for the purposes of the National Labor Relations Act. We accordingly disagree that Bausch & Lomb had a duty under § 8(a)(5) to bargain with the Engineers Union and we decline to enforce the Board's order insofar as it requires Bausch & Lomb to negotiate with that union.

"Successorship," for the purposes of the National Labor Relations Act and other labor statutes, ordinarily requires retention of at least a majority of the "predecessor's" work force. See *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), a case which arose under the Labor Management Relations Act; *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

In *Wiley*, Interscience Publishers, a relatively small firm whose employees were represented by an AFL–CIO local, was merged into a significantly larger publishing house, John Wiley & Sons. Interscience was completely liquidated as a result of the merger and its employees were transferred to the Wiley company. After the merger, the union which had represented the Interscience workers argued that John Wiley & Sons was obligated to honor certain arbitration provisions of the union contract which Interscience had signed before the merger. The Wiley firm resisted the union's claim against it on the grounds that the contract in question was between the union and Interscience, that Interscience no longer existed as a corporate entity, and that Wiley was not obligated to honor the contract to which Interscience had agreed.

The Supreme Court held that, on the facts of the case, Wiley was Interscience's "successor" under the labor laws and therefore bound by the arbitration provisions of the Interscience contract. Such successorship existed because of the "substantial continuity of identity in the business enterprise" from Interscience to Wiley. Such continuity was held to result from "the wholesale transfer of Interscience employees to the Wiley plant." *Wiley, supra* 376 U.S. at 551, 84 S.Ct. at 915.

Eight years later, in *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Supreme Court indicated again that transfer of the work force or, at least a majority thereof, is a requirement for labor law successorship. In *Burns*, the Burns private police agency was awarded a contract for the maintenance of security at an industrial plant previously served by another private security company, the Wackenhut Corporation. To staff its new account, Burns hired twenty-seven of the guards who had worked at that industrial location for Wackenhut before Wackenhut had been replaced by Burns. In addition, Burns brought in fifteen of its own people to complete its manpower requirements at the new location. The question which the Supreme Court confronted was whether Burns was required by § 8(a)(5) to bargain with the union which had represented the security guards at the location when the location had been served by Wackenhut.

The Supreme Court on the authority of *Wiley* answered in the affirmative: Burns was Wackenhut's "successor" and was therefore bound by Wackenhut's pre-existing duty to bargain with the union. Such successorship existed because, among other things, (1) Burns "had in its employ a majority of Wackenhut's former employees" and (2) "these employees had already expressed their choice of a bargaining representative in an election

held a short time before." *Burns, supra* at 278, 92 S.Ct. at 1577.

Burns' duty to bargain as Wackenhut's successor, the Court said,

arose when it selected as its work force the employees of the previous employer to perform the same tasks at the same place they had worked in the past. . . . In an election held but a few months before, the union had been designated bargaining agent for the employees in the unit and a majority of these employees had been hired by Burns for work in the identical unit. . . . It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an "unusual circumstance" as to affect the force of the Board's certification [of a union] within the normal operative period *if a majority of employees after the change of ownership or management were employed by the preceding employer.*

*Burns, supra* at 278–79, 92 S.Ct. at 1577 (emphasis added).

*Wiley* and *Burns* formed the basis of the Court's subsequent successorship decision in *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). In *Howard Johnson,* a national hotel and restaurant company assumed the direct operation of an establishment previously run by local franchise holders. The national corporation purchased all of the personal property held by the local owners and it agreed to lease the motel and restaurant buildings as well. As part of its takeover, the national company fired the supervisory personnel who had managed the establishment for the local owners. Howard Johnson also replaced most of the non-supervisory employees with new personnel of its own choosing.

After this takeover and reorganization, the union, which had represented the fired employees while the franchise was still in local hands, attempted to assert contractual arbitration rights against the national Howard Johnson Company. In the union's view, the national corporation was the "successor" to the local owners and was therefore bound by the contract signed by the union and the local franchisers.

The Court disagreed, holding that successorship arose in *Wiley* and *Burns* only because of the continuity of the work force. In *Wiley,* virtually all of the predecessor's employees worked for the new corporation. In *Burns,* a majority did. But in *Howard Johnson,* only a small fraction of the labor force employed by the old owners continued to work for the national corporation. Hence, there was no continuity of work force and no successorship.

The "continuity of identity" necessary for successorship requires "a substantial continuity in the identity of the work force across the change in ownership." *Howard Johnson, supra* at 263, 94 S.Ct. at 2244. When the new owner hires a substantially different group of employees, there is ordinarily no successorship and the new owner cannot be bound by any of the obligations placed upon the owner before him, including the obligation to bargain with a particular union.

The purpose of the successorship doctrine would not be served by stretching it to cover the situation here. To be sure, mere change in corporate control of an ongoing business should not affect long developed labor-management relationships negotiated in a plant. But when a plant is abandoned for a particular business, and is sold to another firm in a different industry, it makes no sense to burden that plant with a form of labor easement which binds the new owners or operators of the building with obligations worked out in the context of a different industry. It is true that some functions, *e. g.,* heating, must be performed for all buildings, but that fact does not make each building purchaser the successor of the former owner. Substantially greater continuity of operations and personnel is necessary for successorship to be justified.

The former business of General Dynamics is not to be carried on in the North Goodman Street plant under Bausch & Lomb. The fact that the building still needs heat and power is not grounds to make the new occupant, carrying on a completely different business, a successor of the old employer or to make anti-union discrimination under such circumstances a sufficient basis for a bargaining order.[4] Indeed, it is unclear whether the boiler room employees of this one plant constitute an appropriate bargaining unit or whether the appropriate unit consists of all boiler room employees in the plants run by Bausch & Lomb throughout Rochester, or whether, with the change in use of the North Goodman Street building, a wider unit of production employees within the one plant would be a more appropriate bargaining unit. These questions are most properly determined under the conditions of the new employer and new work force.

While respondent here unlawfully discriminated against the former boiler room employees because of their union membership, that violation can be cured without distorting the successorship doctrine to cover this case. *Howard Johnson* makes it plain that *Wiley* is not to be extended to the outermost possible limits of its logic so as to impose labor obligations never contemplated by a new employer.

Bausch & Lomb's refusal to hire because of anti-union animus was wrongful, but in our view that refusal cannot be used as a basis for a duty to bargain with a bargaining unit that never came into existence and that might well be inappropriate under the new circumstances at North Goodman Street.

Hence, we reverse the Board's determination that Bausch & Lomb was General Dynamics' "successor" at North Goodman Street for the purposes of the federal labor law. Accordingly, we hold that the § 8(a)(5) duty of General Dynamics to bargain with the Engineers Union did not devolve upon Bausch & Lomb as its successor.

## V. ALTERNATIVE GROUNDS FOR THE BARGAINING ORDER

The Board, recognizing that its successorship finding might not withstand judicial scrutiny, offered an alternative basis for requiring Bausch & Lomb to bargain with the Engineers Union. This alternative position justifies the bargaining order, not on the basis of the asserted § 8(a)(5) violation, but as a necessary remedy for the § 8(a)(3) and § 8(a)(1) abuses. 214 NLRB ——.

This alternative argument expressly relies on the Board's decision in *Piasecki Aircraft Corp.*, 43 L.R.R.M. 1443 (1959), 123 NLRB 348, *order enforced*, 280 F.2d 575 (3d Cir. 1960).[5]

4. We do not foreclose the possibility that under different circumstances the continuity of a clearly appropriate bargaining unit might be decisive in spite of a change in the employing industry. See 88 Harv.L.Rev. 759 at 765–71 (1975).

5. In *Piasecki*, Bellanca Aircraft, a company which manufactured airplanes in New Castle, Delaware, sold one of its plants to another firm in the industry. The new company, Piasecki Aircraft Corp., declined to hire the Bellanca employees. Instead, Piasecki assembled its own work force for the New Castle manufacturing site.

On the facts of this case, the Board found both § 8(a)(1) and § 8(a)(3) violations. The old Bellanca employees who Piasecki refused

to retain were unionized; the new workers Piasecki selected were not. Hence, the Board found, Piasecki had committed an unfair labor practice in that its refusal to hire the Bellanca workers was motivated by an anti-union animus.

However, the Board specifically held that § 8(a)(5) had not been violated because there was no labor law successorship between Piasecki and Bellanca.

The Board ordered Piasecki, *inter alia*, to bargain with the union which had represented the Bellanca employees before Piasecki bought the New Castle plant. Such a bargaining order was held necessary to remedy the company's violations of § 8(a)(1) and § 8(a)(3). The Board argued that Piasecki's refusal to hire the Bellanca employees was motivated by an un-

We express no opinion on whether the Board was correct to issue its bargaining order in *Piasecki*. We note however, that, although Piasecki was not held a successor of the previous owner, Piasecki did continue to utilize the entire plant in the same business, completing its predecessor's contracts, and that the employees discriminated against by Piasecki comprised a majority of the employees in production in the plant. The facts here are, in those respects, far different from those in *Piasecki*.

It is argued that a bargaining order is necessary to discourage further anti-union activities by the employer. We disagree.

The wrong done the three boiler room employees can be sufficiently remedied by the hiring and back pay order. The establishment of labor-management relations between the operator of the new business and its employees is best left to determination in the regular course of future negotiations, in whatever single or multiple plant units are found appropriate under the employment conditions of the new business at North Goodman Street. We must give due regard to the freedom of choice of employees in the appropriate Bausch & Lomb bargaining units.

## VI. THE MISCELLANEOUS ORDERS

In addition to the major orders which require Bausch & Lomb to bargain with the Engineers Union and which require Bausch & Lomb to offer the three boilermen their old jobs with back pay, the Board issued several rela-

tively minor edicts which we are also asked to enforce.

One such order requires Bausch & Lomb to cease and desist from executing discriminatory hiring policies in the future. In view of the past violations of § 8(a)(3), we grant enforcement.

Similarly, the Board proposes that Bausch & Lomb be ordered to desist from future violations of § 8(a)(1). Again, in light of past behavior we enforce this part of the Board's proposed order.

Thirdly, the Board orders Bausch & Lomb to post the usual notices. The proposed notice should be modified to omit any references to § 8(a)(5) violations and to omit any references to an obligation to bargain with the Engineers Union at the present time. So modified, we enforce the Board's order requiring Bausch & Lomb to post the proposed notice and to report on its compliance.

## VII. SUMMARY

In summary, we uphold the findings of the Board with respect to §§ 8(a)(1) and (3) and we enforce that part of the proposed order designed to rectify the §§ 8(a)(1) and (3) violations. Accordingly, Bausch & Lomb is hereby required to offer the three former North Goodman Street boilermen their old jobs with back pay.

We do not uphold the Board's determination with respect to § 8(a)(5) and we accordingly decline to enforce the proposed order insofar as it requires Bausch & Lomb to bargain with the Engineers Union at the present time.

---

lawful desire to avoid the obligation to bargain with the union. In the absence of a bargaining order, it was held that Piasecki might succeed in its pursuit of that illegal objective. In the Board's words:

> Had not [Piasecki] engaged in illegal discrimination because the persons in the [Bellanca plant] had demonstrated their continued adherence to the Union, [Piasecki] would have become the employer of employees in an appropriate production and maintenance unit represented by the Union; and

as such, [Piasecki] would have been obligated to bargain with the Union upon request. [Piasecki] had thus sought to avoid its bargaining obligation by engaging in unlawful discrimination. We therefore find that to remedy [Piasecki's] 8(a)(3) violations effectively and also to effectuate the policies of the [National Labor Relations] Act, it is necessary that [Piasecki] . . . be ordered to bargain with the Union upon request. 123 NLRB 350.

FRIENDLY, Circuit Judge (concurring and dissenting):

I join in so much of the decision as declines to issue a bargaining order but respectfully dissent from the portion enforcing the orders for reinstatement, back pay, and other relief. Although the majority has corrected the Board's most serious errors and the portions of the order being enforced may have little practical significance, I would deny enforcement altogether.

The difficulty with the portion of the majority opinion from which I dissent is that, like the decision of the ALJ which the Board affirmed, it largely ignores the record evidence of the business realities which Bausch & Lomb, Inc. (B&L) was facing. B&L was not initiating a new operation; it was planning on moving to the North Goodman St. site, which General Dynamics (GD) had vacated, the work that had been going on at the St. Paul St. plant, one of the five plants it had long maintained in Rochester, N. Y. There was uncontradicted testimony that it had been B&L's policy for about twenty years to maintain on its payroll all B&L employees whom it could use, and to advance them when opportunity arose. One member of the company's management stated that strict adherence to this policy for strengthening employee morale was peculiarly necessary because "we heard rumors from our employees that we were moving out of town." Another officer expanded on the point by saying:

> This was a very important thing to our company. In this community, the number of companies that have left for other environments is quite extensive and to maintain a labor force without turnover and people leaving you and not applying for work is a very serious problem. And as a result of this, we wanted to make sure our people understood that they were going to be utilized first, their skills.

Even the General Counsel's witnesses conceded that the company clearly and consistently maintained this position from the start and never deviated from it. For this reason, B&L planned to fill three of the four jobs as stationary engineers in the North Goodman St. plant with boiler room employees already on its payroll at lower wages—believing, until the day of the transfer of control of the plant, that the continued employment of Simpson, who had been GD's chief engineer, would satisfy any need for continuity and special knowledge of the facility. Simpson resigned as a prospective B&L employee, just as the plant was being transferred, upon finding out that a union representative had located another job for him; it was only then that B&L found it necessary to engage an outside consultant, familiar with this particular facility, on a temporary basis.

Whether B&L's decision to man the North Goodman St. boiler room with Simpson, himself a union member, and three of its own non-union employees, thereby maintaining employee morale at the possible cost of some inefficiency at the start, rather than retain all four of the more experienced GD employees, with opposite results, was wise or unwise as a matter of business policy, the decision was one that B&L could make without violating §§ 8(a)(3) or (1) of the National Labor Relations Act. The second and third "basic facts" relied on by the ALJ and the majority thus have no tendency whatever to support an inference of ulterior motive.

The fourth "basic fact," that B&L failed to offer alternative employment to the three other men, is unsupported by substantial evidence, except perhaps on a strictly literal reading of the record which conceals rather than reveals the actual facts. The union's business agent testified, and the record is uncontradicted, that B&L told him early in the game that it was prepared to offer the three men jobs in B&L's maintenance department or pipe shop. The three men were interviewed on September 24, but this was too early for action since the date of the transfer to North Goodman St. was

uncertain. Simpson admitted that, on or about November 1, Ellis Faro, B&L's employment director, told him to, "sound out these gentlemen" concerning a possibility of employment. Beyond that, the most that appears from the testimony is that the three men might reasonably have believed that B&L would take the lead in making further contact; as a matter of ordinary employment practice, it seems that the company might have believed the opposite. In fact, no one contacted anyone, and the men got other jobs. Whoever was at fault, this scarcely presents a picture of three men eagerly seeking B&L employment and being refused because of anti-union animus.

All that remains is Simpson's testimony, denied by Faro but credited by the ALJ, that on the same occasion in late October or very early November referred to above, when Simpson was trying to persuade B&L to retain the three other men in their existing jobs, Faro said "We can't touch any of those men . . . . If we touch anyone of those men, we have to take the union contract and you know that this company has never dealt with the union and never intends to deal with the union." Putting aside any question of Faro's authority to discuss policy matters of this sort and disregarding the point that, in light of the majority's correct construction of § 8(a)(5), his remark was based on a misapprehension of the law, the lack of anti-union animus was shown by the very next portion of Simpson's testimony, namely, that Faro inquired whether the men would consider other suitable jobs with B&L, asked Simpson to sound them out, and suggested that, if B&L's own people should prove unqualified, this might be a way to get the three men back to the boiler room without creating, as Faro mistakenly thought, an automatic obligation of B&L to deal with the union as representing the boiler room employees. The interview ended with Simpson's accepting B&L's offer for himself and agreeing to sound out the three other men.

The ALJ's decision in this case and, with all respect, the majority's deference to the §§ 8(a)(3) and (1) portions of it come within Mr. Justice Frankfurter's description of practices which Congress intended to end when it passed the Taft-Hartley Act. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is our obligation to look at the record as a whole, and not just at a scrap of evidence that supports the Board's decision. On that basis, the record demonstrates that B&L was following the permissible policy of staffing the new facility with its own employees, guided by Simpson's experienced hand if he was willing to work for it, by that of someone else if he was not. B&L was willing to employ the three other GD employees, once they became available, as openings appeared, but the three never pressed the matter. To sanction the predicating of a finding of violation of § 8(a)(3) and consequently § 8(a)(1) on a single remark of one supervisory employee, who either was making up his own mind on the law or had been misadvised, when there is no other basis for it, is not consistent with our "responsibility for assuring that the Board keeps within reasonable bounds," 340 U.S. at 490, 71 S.Ct. at 466.