634 F.2d 681
 105 L.R.R.M. (BNA) 3274, 90 Lab.Cas. P 12,381
 SAKS & COMPANY, Petitioner-Appellant-Cross Appellee,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee-Cross Appellant,
Amalgamated Clothing and Textile Workers Union, Pittsburgh
District Joint Board, Local 86, AFL-CIO-CLC, Intervenor.
 Nos. 90, 601, Dockets 80-4029, 80-4057.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 15, 1980.
Decided Nov. 14, 1980.
 
 1
 John C. Grosz, New York City (Solinger & Gordon, New York City, Eugene H. Gordon, Eric H. Fisher, William J. Adelson, New York City, of counsel), for petitioner-appellant-cross appellee.
 
 
 2
 Allison W. Brown, Jr., N.L.R.B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., of counsel), for respondent-appellee-cross appellant.
 
 
 3
 Leonard Schneider, Amalgamated Clothing and Textile Workers Union, AFL-CIO, Detroit, Mich. (Arthur M. Goldberg, Gen. Counsel, George Kirschenbaum, Amalgamated Clothing and Textile Workers Union, AFL-CIO, New York City), for intervenor.
 
 
 4
 Before FRIENDLY and MESKILL, Circuit Judges, and BONSAL, District Judge.*
 
 BONSAL, District Judge:
 
 5
 Saks & Co. ("Saks") petitions for review of a Decision and Order of the National Labor Relations Board ("NLRB") issued against Saks on February 14, 1980 (247 NLRB No. 128). The NLRB cross-appeals for enforcement of its Order. The Amalgamated Clothing and Textile Workers Union ("Union") has intervened in support of the Order.
 
 
 6
 The NLRB found that Saks had violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(5), by refusing to bargain with the union representing the alterations employees at the Saks store in Pittsburgh and in unilaterally setting the initial terms and conditions of employment of those employees. The NLRB's Order requires Saks to recognize and, if requested, bargain with the union and to make whole the employees for any losses suffered because of Saks' unlawful conduct.
 
 THE FACTS
 
 7
 Saks is a New York corporation which operates a nationwide chain of retail stores. For many years, Saks has operated a "Saks Fifth Avenue" store in Pittsburgh, Pennsylvania located on the sixth floor of the building which houses the department store of Gimbel Brothers, Inc. ("Gimbels"). All of the capital stock of Saks has been owned by Gimbels since 1924. The two companies file consolidated income tax returns. Saks nonetheless operates its stores independently of Gimbels and the two companies have separate officers and separate labor relations policies.
 
 
 8
 In 1973, Brown and Williamson, Inc. purchased all of the outstanding stock of Gimbels and, since 1975, the chairmen of both Saks and Gimbels have reported directly to the chief executive officer of Brown and Williamson.
 
 
 9
 Until August 10, 1977, Saks operated its Pittsburgh store in the Gimbels building pursuant to a written lease. Saks subcontracted its alterations work on women's garments to Gimbels, the work being performed by Gimbels employees, Gimbels paying social security taxes and premiums for unemployment insurance and workmen's compensation. Saks reimbursed Gimbels for the cost of labor, paid a fee for supervision by a Gimbels employee, and paid a portion of the fringe benefits of the Gimbels employees working on Saks garments.
 
 
 10
 Until about August 12, 1977, Gimbels maintained separate work areas for the alterations employees, one being used for alterations work on garments sold by Gimbels, and the other for alterations work on garments sold by Saks.
 
 
 11
 On August 12, 1977, the two areas occupied a large room, divided in half by a partition, on the thirteenth floor of the Gimbels store. Gimbels employed 18 employees in the Saks area and 10 in the Gimbels area. The Saks area performed alterations only on women's garments, while the Gimbels area performed alterations on both men's and women's garments. While Gimbels' manager of alterations supervised both work areas, Alfred Gianta, Saks' manager of alterations, was responsible for the quality of work performed in the Saks area.
 
 
 12
 The Union has been recognized by Gimbels since 1937 as the exclusive bargaining representative of its alterations employees. The most recent collective bargaining agreement (February 16, 1976 to February 15, 1979) recognized the Union as the exclusive bargaining representative of its alterations employees in the Pittsburgh metropolitan area. The agreement, which contains union security and check-off provisions, was negotiated between the Union and the Labor Standards Association, a multi-employer association of which Gimbels is a member.
 
 
 13
 On June 15, 1976, Saks signed a lease for a retail store facility, located one block from the Gimbels store, in downtown Pittsburgh, and at the same time notified Gimbels that it would be closing its operations within the Gimbels store. By letter of July 7, 1977, Saks notified Gimbels that it would be establishing its own alterations workroom in its new Pittsburgh store and therefore would no longer require the services of Gimbels' alterations workroom. On July 15, Richard Mascaro, the director of labor relations at Gimbels, inquired of John Bullis, the senior vice-president of Saks, whether Saks would consider interviewing for employment at its new Pittsburgh store those alterations employees who would be displaced as a result of Saks' relocation decision. Bullis replied that Saks would be happy to arrange such interviews and noted that both the Saks personnel director and the Saks manager of alterations would be interviewing applicants in late July. Mascaro informed the Union's business representative of Gimbels' intention to close the Saks alteration work area. Mascaro then informed the employees in the Saks area of the closing and informed them that they could apply for jobs at Saks' new Pittsburgh store.
 
 
 14
 Following interviews, Saks hired 16 of the 18 Gimbels employees who had worked in the Saks area. Saks closed its store at the Gimbels location on August 10, 1977, and on August 15, the 16 former Gimbels employees began working at Saks' new Pittsburgh store under the supervision of Mr. Gianta.
 
 
 15
 At its new store, Saks added men's and children's garments to its line of women's garments, so that the scope of its alterations department was expanded.
 
 
 16
 The weekly wage of the former Gimbels employees hired by Saks remained unchanged at first. Changes were made in both working conditions and fringe benefits, however, which included a shortening of the work week, the substitution of a different pension plan, and an alteration in the paid vacation policy.
 
 
 17
 On or about July 29, 1977, Henry Dropkin, International Vice-president of the Union and manager of the Union's Pittsburgh Joint Board, was informed by Mr. Bullis that Saks would not recognize the collective bargaining agreement as applying to the alterations employees in its new store and did not recognize the Union as their bargaining representative.
 
 
 18
 By letter of June 1, 1978, Bullis informed Dropkin that Saks would bargain with the Union only when it had been certified by the NLRB as the collective bargaining representative for the alterations employees at Saks.
 
 
 19
 On February 14, 1980, the NLRB issued its Decision and Order finding Saks' actions to be violative of the National Labor Relations Act. The NLRB determined that Saks was a successor employer to Gimbels with respect to the alterations employees at Saks' Pittsburgh store, whom, the NLRB found, constituted an appropriate bargaining unit. The NLRB therefore concluded that Saks violated Sections 8(a)(1) and (5) of the Act by refusing to bargain with the Union as the representative of these employees. The NLRB also found, over one dissent, that Saks had violated Sections 8(a)(1) and (5) by unilaterally setting the initial terms and conditions of employment of the alterations employees after it refused to bargain with the Union.
 
 DISCUSSION
 
 20
 The NLRB found that Saks was a successor employer to Gimbels and that therefore, by refusing to bargain with the Union, Saks had violated Sections 8(a)(1) and (5) of the National Labor Relations Act. Saks contends that it was not a successor employer to Gimbels and consequently was not required to bargain with the Union.
 
 
 21
 "The key factor in determining whether an employer succeeds to an obligation to bargain with the incumbent union is the substantial continuity in the identity of the workforce." Nazareth Regional High School v. N.L.R.B., 549 F.2d 873, 879 (2d Cir. 1977). See also N.L.R.B. v. Burns International Security Services, Inc., 406 U.S. 272, 280-81, 92 Ct. 1571, 1578-79, 32 L.Ed.2d 61 (1972); Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees, 417 U.S. 249, 262-65, 94 S.Ct. 2236, 2243-44, 41 L.Ed.2d 46 (1974). Until August 12, 1977, Gimbels employed 35 alterations workers in the Pittsburgh metropolitan area, 28 of whom worked at its downtown Pittsburgh store. Of the first 20 alterations workers employed at Saks' new Pittsburgh store, 16 were formerly employed by Gimbels to work on Saks garments.
 
 
 22
 Saks contends that because it did not hire a majority of the employees in the predecessor bargaining unit at Gimbels, a finding of successorship is inappropriate here.[1] This argument is precluded, however, by our decision in Nazareth, supra. In that case, the predecessor bargaining unit included approximately 400 lay teachers employed in nine diocesan schools. The successor unit comprised 55 teachers in one school of which 47 had been employed by the predecessor. Using as a denominator the number of employees in the successor employer's bargaining unit, we found the requisite continuity of identity in the work force satisfied by the proportion of 47 to 55, even though those 47 employees fell far short of a majority of the predecessor's bargaining unit of 400. On the issue of whether the decrease in the size of the unit rebutted the presumption of continuing majority status, we said:
 
 
 23
 We agree with the NLRB's determination, however, that diminution in unit size is insufficient to rebut the presumption of continued majority status .... As the court pointed out in NLRB v. Band-Age, Inc., 534 F.2d 1 (1st Cir.), cert. denied, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976), such diminution in unit size would not affect the operation of the presumption in a non-successor situation, see, NLRB v. Armato, 199 F.2d 800, 803 (7th Cir. 1952), and there is no reason why the presumption should be applied differently when the reduction in unit size occurs as a result of a change in ownership. 534 F.2d at 4.
 
 
 24
 Nazareth Regional High School v. N.L.R.B., supra, 549 F.2d at 879-80.
 
 
 25
 We think this holding establishes, at least where the question is simply one of the successor's duty to bargain, that the appropriate test of continuity is whether a majority of the successor's bargaining unit is composed of the predecessor's employees.[2] With no clear guidance from the Supreme Court,[3] the courts of appeals have arrived at results similar to our own. See, in addition to N.L.R.B. v. Band-Age, Inc., supra, 534 F.2d at 4 n.6; Zim's Foodliner, Inc. v. N.L.R.B., 495 F.2d 1131, 1141-42 (7th Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); Boeing Co. v. International Association of Machinists & Aerospace Workers, 504 F.2d 307, 319 (5th Cir. 1974), cert. denied, 421 U.S. 913, 95 S.Ct. 1570, 43 L.Ed.2d 779 (1975); N.L.R.B. v. Fabsteel Co., 587 F.2d 689, 695 (5th Cir.), cert. denied, 442 U.S. 943, 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979); N.L.R.B. v. Middleboro Fire Apparatus, Inc., 590 F.2d 4, 8 (1st Cir. 1978); International Union of Electrical, Radio & Machine Workers v. N.L.R.B., 604 F.2d 689, 695 (D.C. Cir. 1979). See also Note, supra, 88 Harv.L.Rev. at 771 n.76.
 
 
 26
 Here the 16 employees hired by Saks constituted a majority of the 20 employees in the Saks unit.[4] There is no reason to think that these 16 did not represent the same measure of Union support as did Gimbels' bargaining unit of 35. The accuracy of this conclusion is enhanced by the fact that the contract between Gimbels and the Union required all alterations employees to be members of the Union and provided for their dues to be "checked off" by the employer.
 
 
 27
 We note that there was a minimal change in the conditions of employment experienced by the alterations employees themselves. Saks' effort to distinguish the service it now provides in its alterations department from that formerly performed by Gimbels employees is unpersuasive. As the NLRB noted in its decision, the actual service rendered and the methods by which that service is performed remain unchanged. The work requires the use of the same skills: sewing, cutting, and working with fabric. Saks asserts that its alterations employees perform, for the first time, work on men's and children's clothing in addition to women's clothing. There is no evidence, however, that the skills involved are materially different, or that special training or equipment is required. On the contrary, the minor change in the work of the alterations employees is not sufficient to prevent a finding of successorship. See N.L.R.B. v. Middleboro Fire Apparatus, Inc., 590 F.2d 4, 7 (1st Cir. 1978); N.L.R.B. v. Interstate 65 Corporation, 453 F.2d 269, 272-73 (6th Cir. 1971).
 
 
 28
 Saks argues that the alteration of clothing was merely incidental to Gimbels' retail operation and cites N.L.R.B. v. Bausch & Lomb, Inc., 526 F.2d 817 (2d Cir. 1975) as dispositive. In that case, this court denied enforcement of an NLRB order requiring the purchaser of a building to bargain with the union which had represented the boilerroom employees of the seller. The court took note of the fact that the building had been abandoned and was sold to another firm in a completely different industry. Since Saks and Gimbels are both retail department stores, this case is clearly distinguishable from Bausch & Lomb.
 
 
 29
 Our dissenting brother terming the result we reach an expansion of the successorship doctrine, would hold a successor not to have a duty to bargain unless he hired a majority of the employees in the predecessor bargaining unit or failing that, acquired the predecessor's assets. We find no sufficient basis for this in the cases, and also fail to see how it is recommended by the policies underlying the successorship doctrine.
 
 
 30
 We likewise do not understand the prominence the dissenting opinion gives to the transfer of assets. The degree of continuity between employers in business operations is significant because it serves as an indicator of the corresponding change in the expectations and needs of the employees and their views with respect to continued union representation. Zim's Foodliner, Inc. v. N.L.R.B., supra, 495 F.2d at 1140-41. International Union of Electrical, Radio & Machine Workers v. N.L.R.B., supra, 604 F.2d at 694. Thus, while a transfer of assets may be evidence of the requisite continuity of business operations, it has not been thought to be a necessary condition, see, e.g., Burns, supra; Tom-A-Hawk Transit, Inc. v. N.L.R.B., 419 F.2d 1025, 1027-28 (7th Cir. 1969), and more than one authority has characterized it as a "make-weight". See Gorman, Basic Text on Labor Law 118 (1976); Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735, 805 (1969). Certainly it is hard to see how the employees' attitudes toward representation by the Union in this case would have been altered had Saks purchased Gimbels' sewing machines or its stock of needles and thread. See Goldberg, supra, at 805-06.
 
 
 31
 Although we hold that Saks was a successor employer, it does not follow that Saks was precluded from establishing different conditions of employment, subject, of course, to a later collective bargaining agreement. A successor employer ordinarily may establish initial terms and conditions of employment without bargaining with the incumbent union. N.L.R.B. v. Burns International Security Services, Inc., supra, 406 U.S. 272, 294-95, 92 S.Ct. 1571, 1585-86, 32 L.Ed.2d 61 (1972); Nazareth Regional High School v. N.L.R.B., supra, 549 F.2d 873, 880-81 (2d Cir. 1977); Bellingham Frozen Foods, Inc. v. N.L.R.B., 626 F.2d 674, 678 (9th Cir. 1980). In its conclusion that Saks violated Sections 8(a)(1) and (5) by setting the initial terms and conditions of employment of the alterations employees, the NLRB relied on a narrow exception articulated by the court in Burns, supra. Under that exception, as developed by the NLRB, a successor employer is required to bargain with respect to initial terms only if it is perfectly clear that it plan to retain all the employees in the predecessor unit and hires those employees in a manner which leads them to believe that they will be hired on the terms and conditions that existed under the predecessor employer. Burns, supra at 294-95, 92 S.Ct. at 1585-86.
 
 
 32
 Although Saks did express a willingness to interview and hire those alterations employees at Gimbels who had worked on Saks garments, the record is silent with respect to the terms and conditions promised to those Gimbels employees ultimately hired. Saks maintains that it did not lead any employees to believe that they would be hired on the terms prevailing at Gimbels, or in fact on any terms other than those prevailing at Saks.
 
 
 33
 Determination of whether Saks misled Gimbels employees into believing that they would be hired on terms identical to those of their Gimbels employment is therefore reduced to a question of burden of proof. In unfair labor practice proceedings, "the Board's attorney has the burden of proof of violations of Section 8 of the National Labor Relations Act ...." 29 C.F.R. § 101.10(b) (1979). The Board's General Counsel has not here established that Saks intended to retain all employees of its predecessor who worked on Saks clothing. The record reveals only that Saks invited those employees to apply for positions and does not indicate whether Saks limited its search to employees of the predecessor.
 
 
 34
 Although this conclusion does not affect the NLRB's bargaining order, it does require deletion of that part of Clause 2(b) of the NLRB's Order which compels Saks to make restitution for any wages and benefits that may have been lost as a result of its unilateral imposition of terms and conditions of employment.
 
 
 35
 Enforcement granted in part and denied in part. No costs.
 
 MESKILL, Circuit Judge, dissenting:
 
 36
 I respectfully dissent. The majority's decision today expands the application of the successorship doctrine beyond the outermost boundary set by the Supreme Court in NLRB v. Burns International Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). I believe that the facts of this case do not support the majority's conclusion that Saks incurred a duty to bargain with the Union as a successor-employer. While the circumstances that surrounded the change in employer in this case on the surface may seem to satisfy the tests traditionally applied in successorship cases, a closer analysis of the facts and the law reveals the inappropriateness of its application here.
 
 
 37
 While we have stated that "(t)he key factor in determining whether an employer succeeds to an obligation to bargain with the incumbent union is the substantial continuity in the identity of the workforce," Nazareth Regional High School v. NLRB, 549 F.2d 873, 879 (2d Cir. 1977), that statement was made in the context of a complete transfer of the ownership and control of an entire enterprise. In Nazareth, the lay faculty members of 9 diocesan schools, which comprised the M. Hald High School Association, were covered by a collective bargaining agreement. One of the schools, Nazareth, was taken over by a local community group. Forty-nine of the 56 teachers at Nazareth were retained by the new employer. We noted that a primary consideration in determining whether to impose upon a new employer a duty to bargain with an incumbent union is the continued majority status of such union. Nazareth, supra, 549 F.2d at 879. The continuity of workforce test, reflecting this consideration, was met in that case where only 7 out of the original staff of 56 teachers were not retained. Tests such as continuity of the business enterprise and identity of the workforce, however, also reflect the recognition by the courts that a purchaser of a business ordinarily is free to modify the nature of the business acquired and hire his own employees. In Howard Johnson Co. v. Hotel Employees, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), Howard Johnson Co. purchased the Bellville Restaurant Co. but retained only 9 of Bellville's 53 employees. The Supreme Court held that Howard Johnson Co. was under no duty to bargain as a successor-employer with the 9 employees' collective bargaining representative, since the retention of 9 of 53 employees did not satisfy the continuity of workforce requirement.
 
 
 38
 The successorship doctrine originally was designed to prevent a change in ownership of a going concern from adversely affecting the rights of organized employees.[1] See John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). In Wiley, where the predecessor employer disappeared in a corporate merger, the Court refused to permit a change in corporate ownership from infringing the rights of organized employees. The scope of the doctrine was expanded, in NLRB v. Burns International Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), where one security guard company, Burns, displaced another, Wackenhut, by winning the contract to provide security services at a Lockheed plant. Burns retained 27 of Wachenhut's 42 guards and brought in 15 of its own. The Court determined that Burns' retention of a majority of its predecessor's workforce bound Burns to bargain with the former Wackenhut employees' union. Significantly, the Court stated that the "source of its duty to bargain with the union (was) not the collective-bargaining contract but the fact that it voluntarily took over a bargaining unit that was largely intact and that was certified within the past year." 406 U.S. at 287, 92 S.Ct. at 1582 (emphasis added). Although Burns acquired neither assets nor a portion of Wackenhut's business enterprise, the Court held that Burns' hiring of a majority of the employees from the Wackenhut bargaining unit sufficed. Justice Rehnquist in his dissent opined that the Burns majority "stretched that concept beyond the limits of its proper application," 406 U.S. at 296, 92 S.Ct. at 1586, and that he would confine the doctrine's application to those cases where a transfer of tangible or intangible assets accompany the change in employer. 406 U.S. at 305, 92 S.Ct. at 1590. In any event, Burns suggests that, at a minimum, an employer must have retained a majority of the predecessor's employees before incurring a duty to bargain as a successor-employer.
 
 
 39
 Border Steel Rolling Mills, Inc., 204 N.L.R.B. 814, 815 (1973). Interestingly, even where a majority-of-the-successor-employees test was satisfied, in the absence of other factors that would establish that the business enterprise continued substantially the same as under the predecessor, the Board in the past repeatedly refused to impose a duty upon the purported successor employer to bargain. See, e.g., Cagle's Inc., 218 N.L.R.B. 603, 604 (1975); Co-op Trucking Co., Inc., 209 N.L.R.B. 829, 831 (1974); Norton Precision, Inc., 199 N.L.R.B. 1003, 1007-08 (1972); Georgetown Stainless Mfg. Corp., 198 N.L.R.B. 234, 237 (1972). It is conceded that "continuity of the workforce" is the primary factor to be weighed in these cases; however, the overall test to be met is whether there has been " 'substantial continuity of identity of the business enterprise,' " Howard Johnson Co., supra, 417 U.S. at 259, 94 S.Ct. at 2241-42 (quoting Wiley, supra, 376 U.S. at 551, 84 S.Ct. at 915). Thus while, as the majority suggests, the attitudes of the employees in this case toward representation by the Union hardly would have been "altered had Saks purchased Gimbels' sewing machines or its stock of needles and thread," Majority op. at 687, the purchase of such assets would certainly be relevant to determining whether substantial continuity of the business enterprise or employing industry occurred. While the continuity of the workforce requirement occupies a position of prominence among the factors to be evaluated in successorship cases, courts should not overemphasize this factor so as to reduce other relevant criteria to utter insignificance.
 
 
 40
 The majority here acknowledges that the 16 employees hired by Saks do not constitute a majority of Gimbels' 35 alterations employees, yet, relying on Nazareth, nevertheless declares that "the appropriate test of continuity is whether a majority of the successor's bargaining unit is composed of the predecessor's employees." (Majority op. at 685). The actual bargaining unit in this case consisted of 35 Gimbels and 75 Kaufman's Department Store employees, totaling 110. Similarly, in Nazareth, teachers in the 9 schools that formed the Hald Association comprised the bargaining unit, and a majority of only one segment of that unit-a majority of the teachers at Nazareth High School-changed employer. The similarity to the case at bar and Nazareth becomes even closer when it is pointed out that the 16 employees hired by Saks came exclusively from the 28-man alterations department in Gimbels' downtown Pittsburgh store. Thus, as in Nazareth where the successor hired a majority of the teachers from one discrete segment of the bargaining unit, the Nazareth High School, here Saks hired a majority of the alterations employees from one discrete segment of the bargaining unit, the downtown Pittsburgh store. But there the similarity between the two cases ends. As noted earlier, in Nazareth a complete going concern with all of its tangible and intangible assets accompanied the transfer of employees. In the case at bar, however, only a migration of employees occurred. Unlike Wiley and Nazareth, no business enterprise changed hands. Unlike Burns, a majority of the actual bargaining unit of 110 was not hired by Saks. Only 16 employees were hired.
 
 
 41
 I have great difficulty in imposing upon an employer a duty to bargain with a particular union where only a fraction of a collective bargaining unit has been hired. Where the net effect of the event is a movement of employees from one employer to another, it would be more prudent to circumscribe the scope and applicability of the successorship doctrine. Obviously, the simple hiring of several employees, who by happenstance belonged to the same union will not obligate an employer to bargain with that union. Such a rule would invite discrimination by potential employers against former union members. I believe the majority's decision here, although well-intended, may precipitate similar results. If an employer who accepts applicants from a unionized subcontractor to perform services previously performed by the subcontractor automatically incurs a duty to bargain with their former union, discrimination will likely occur. Although it can be argued that discriminatory practices are condemned by and actionable under Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1976), it is obvious that the perspicacious, well-counselled employer will hire just few enough of the subcontractor's employees to elude the grasp of the successorship doctrine.
 
 
 42
 In the absence of the transfer of any tangible or intangible assets, a mere "migration" of employees from one employer to another should trigger the successorship doctrine only where a majority of the old bargaining unit is hired and the employees perform substantially the same work. Where fewer than a majority of the old bargaining unit are hired and perform substantially the same work, the successorship doctrine should apply only where a transfer of intangible or tangible assets accompanies the shift of employees. These two sets of circumstances represent the minimum conditions that warrant invoking the successorship doctrine. Where, as here, a mere fraction of a bargaining unit migrated to a new employer, application of the successorship doctrine is unwarranted.
 
 
 43
 If I agreed with the majority that Saks was a successor-employer, I would also agree that it nevertheless was not precluded from establishing different initial terms and conditions of employment for the reasons spelled out by Judge Bonsal above.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 As part of this argument Saks insists that the predecessor bargaining unit contained 110 employees, not 35. It arrives at the larger figure by adding to the 35 Gimbels employees the 75 employees who worked for the Kaufman Division of the May Department Stores Co., the other member of the multi-employer association that has been a party to successive collective bargaining agreements with the Union
 Given our conclusion that the relevant proportion for determining the successor's duty to bargain is the number of the predecessor's employees hired by the successor divided by the total number of employees in the successor bargaining unit, the size of the predecessor unit is not an issue of great moment. Gimbels voluntarily recognized the Union in 1937 before the multi-employer association even existed, and that act created a presumption of the Union's continued majority status in the Gimbels bargaining unit. See N.L.R.B. v. Master Touch Dental Laboratories, 405 F.2d 80, 82 (2d Cir. 1968); N.L.R.B. v. Cayuga Crushed Stone, Inc., 474 F.2d 1380, 1383-84 (2d Cir. 1973). Thus, assuming that the size of the predecessor unit is a significant factor in determining the likelihood of union support among the transferred employees, the more relevant unit is the Gimbels group of 35, not the larger unit of 110.
 
 
 [2]
 Saks relies on our decision in N.L.R.B. v. Bausch & Lomb, Inc., 526 F.2d 817 (2d Cir. 1975), as establishing that a finding of successorship "requires retention of at least a majority of the 'predecessor's' work force." Id. at 824. It is true that in Bausch & Lomb, in the process of describing the relevant Supreme Court precedents, we spoke as though the hiring of a majority of the predecessor's unit constituted the minimum test of successorship. However, in that case, the issue of which test to apply was not before us since none of the predecessor's employees had in fact been hired. Our disagreement with the Board's finding of successorship centered instead on the complete change in the business operation, and on doubts about the continued appropriateness of the former bargaining unit under the changed circumstances
 
 
 [3]
 N.L.R.B. v. Burns International Security Services, Inc., supra, contains conflicting language, compare 406 U.S. at p. 278 with pp. 279, 281, 92 S.Ct. at p. 1577 with pp. 1577, 1579, perhaps explained by the fact that in that case, the successor and predecessor bargaining units were identical in size so that it was of no consequence which unit was used as the denominator. See Boeing Co. v. International Association of Machinists & Aerospace Workers, supra, 504 F.2d at 319 n.18. Howard Johnson Co. v. Detroit Local Joint Executive Board, supra, which focused on the issue of the successor employer's duty to arbitrate, noted with approval "the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor in § 301 suits under Wiley," 417 U.S. at 263-64, 94 S.Ct. at 2243-2244 (footnote omitted). This language does not conclusively establish which "majority" was intended, nor do the sources cited in the supporting footnote, which include at least one case and one law review comment clearly rejecting the majority-of-the-predecessor-bargaining-unit test. See Local Joint Executive Board, Hotel & Restaurant Employees v. Joden, Inc., 262 F.Supp. 390, 392, 396 (D.Mass.1966); Comment, Contractual Successorship: The Impact of Burns, 40 U.Chi.L.Rev. 617, 621 (1973)
 
 
 [4]
 The NLRB based its determination of the appropriateness of the successor bargaining unit on the history of separate bargaining enjoyed by Gimbels' alterations employees and the fact that these employees have traditionally had ascertainable common interests. In determining the proper bargaining unit, the NLRB applies the "community of interest" test. N.L.R.B. v. Certified Testing Laboratories, Inc., 387 F.2d 275, 277 (3d Cir. 1967). This determination is largely factual, "involves a large measure of informed discretion, and if not final, is rarely to be disturbed." Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947)
 
 
 [1]
 The majority's decision rests on the premise that only two criteria need be satisfied to invoke the successorship doctrine: 1) that a majority of the successor's workforce consist of predecessor employees, and 2) that those employees perform substantially the same work. Their decision, however, eliminates several factors that the Board itself formulated even following the Supreme Court's liberal application of the doctrine in Burns:
 Whether there has been a substantial continuity of the same operations; (2) whether the new employer uses the same plant; (3) whether the new employer has the same or substantially the same workforce; (4) whether the same jobs exist under the same working conditions; (5) whether the new employer employs the same supervisors; (6) whether the new employer uses the same machinery, equipment and methods of production; and (7) whether the new employer manufacturers (sic) the same product or offers the same services.