POLYNESIAN CULTURAL CENTER, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–1851.

United States Court of Appeals, Ninth Circuit.

July 18, 1978.

Jared H. Jossem (argued), Honolulu, Hawaii, for petitioner.

John Burgoyne (argued), Washington, D.C., for respondent.

Before SNEED and TANG, Circuit Judges, and ORRICK *, District Judge.

SNEED, Circuit Judge:

This action is before us on a petition filed by the Polynesian Cultural Center (hereinafter PCC) to review and set aside the National Labor Relations Board's order and the cross-application by the NLRB for enforcement of that order. The decision of the Board is reported at 222 NLRB 172. The PCC challenges both the substantiality of the evidence supporting the Board's conclusion that the PCC violated sections 8(a)(1) and (3) of the National Labor Relations Act[1] by discharging six employees and by refusing to hire another person and the propriety of the reinstatement and back pay orders entered by the Board. PCC also asserts, for the first time in a supplemental brief filed in connection with this appeal, that the NLRB lacks jurisdiction over it because of the Religion Clauses of the First Amendment. For reasons set forth hereafter, we refuse to consider the jurisdictional issue. Also we find that the PCC's actions were in violation of the Act, but we hold that certain of the specific remedial orders entered by the Board were inappropriate and accordingly limit enforcement of the order.

I. *Facts*

A. *The Dispute*

The Polynesian Cultural Center, Inc. is a nonprofit corporation wholly owned by the Church of Jesus Christ of Latter Day Saints. The center itself is a large facility in Laie, Hawaii, where recreations of six different Polynesian villages are housed. Tours and exhibitions are given to visiting tourists who pay the entrance fee. The funds earned by the center are used to support the activities of Brigham Young University—Hawaii (hereinafter BYU-H), an educational institution operated by the church. The college and the PCC are closely linked, both in terms of physical proximity and religious purpose. Management of the PCC is entrusted to a Board of Directors appointed by the church hierarchy in Salt Lake City, Utah. Day-to-day management functions were carried out by a team headed by Mr. Norman Nielsen and Mr. Vernon Hardisty.

The employees of the PCC consisted of both Polynesian students at BYU-H who worked part-time and full-time employees, many of whom had been recruited from Polynesia and brought to Hawaii by the PCC. In January 1973 twenty Fijians, including the six whose subsequent discharge resulted in the instant proceeding, were recruited in Fiji to work at the PCC. They signed six-month probationary contracts before leaving Fiji. There is strong evidence that the group was concerned with the short term of the initial contracts and sought a guarantee of additional employment if their work was satisfactory. The record indicates that Mr. Hardisty gave some form of guarantee, but it is disputed whether it was a two year *maximum* term or a two year *minimum* term.

The Fijians arrived in February 1973. On the expiration of the six-month probationary period, the six employees involved in this action were all given a further one year contract extending through August 5, 1974. These contracts included a provision requiring the employees to observe church rules, which include a strict code of conduct.

The first labor troubles began when Noa Naivi, the leader of the group of Fijians who had come to the PCC in February 1973, was terminated on November 1, 1973. Dr. James Anthony, a Fijian who recently had been employed as a professor at the Univer-

* Honorable William H. Orrick, Jr., District Judge, United States District Court for the Northern District of California, sitting by designation.

1. "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7] of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ." Sections 8(a)(1) & (3); 29 U.S.C. §§ 158(a)(1) & (3).

sity of Hawaii and who had been active in labor disputes in Fiji, agreed to assist Naivi in dealing with the PCC. A meeting chaired by Anthony was held in December 1973 and attended by many of the Fijian employees of the PCC. The group discussed Naivi's firing as well as other problems regarding their employment at the PCC. A petition was drafted addressed to the PCC management concerning wage rates, medical insurance coverage, fringe benefits, job descriptions, housing, the authenticity of the exhibits and the rehiring of Naivi. While this petition was never delivered, there is evidence in the record which indicates that Hardisty and Nielsen knew that these meetings were taking place. Anthony's efforts on behalf of Naivi ceased in January 1974 when the two had a disagreement. Anthony continued to meet sporadically with some of the Fijian employees during the winter and spring, as they complained to him of new problems at the Center.

Anthony next became involved in problems with the PCC when he intervened on behalf of the chief of the Fijian village, Sigavata, who was having difficulty obtaining an extension of his visa. After a meeting with PCC and Immigration officials in early June the visa was extended. Other Fijian employees then expressed concern to Anthony about their visa status and the PCC's handling of the matter. On June 4, 1974, Anthony met with Nielsen and informed him of "the latent discontent" among the Fijian employees. The Fijians held meetings on June 6 and 8 and reactivated the organizational structure which had been developed in December. Anthony communicated often with Nielsen during this period, with discussions focusing on the visa problem. On June 18 Anthony called Dennis Shipley, personnel manager at the PCC, in regard to the visas. There was an angry conversation between the two men. In an internal memo dated that same day Shipley informed Nielsen that the Fijian contracts would be expiring on August 5 and recommended that they not be renewed, but that the employees be retained on a month-to-month basis if needed. An-

thony obtained a copy of this memo from Sigavata, the Fijian chief, and discussed the contents with the Fijian employees.

The Fijians then decided to make formal demands on management. A document entitled "Proposed Modification to Contract" was drafted by Anthony and delivered to PCC management on July 7. The demands included better wages, specific guarantees as to working conditions and an extension of the contract until February 1975. On July 10 Nielsen informed Anthony that the PCC would not bargain with him. On July 11 Nielsen caused termination letters to be prepared for the six Fijians involved in this action, but they were not immediately delivered. On July 16 the six employees received word from Nielsen that he wanted to meet with them. Anthony advised them not to go unless Nielsen consented to Anthony's attendance. After the employees failed to show up for the meeting on July 17, Nielsen had the termination letters of July 11 delivered. The employees were also given three-day disciplinary suspensions because of their refusal to meet with a supervisor.

Community meetings were held on July 13 and 20 to explain the Fijians' position to the community at large. These meetings were attended by over a hundred people. After the meeting on July 20 Anthony and the employees met with Mr. Nielsen. Nielsen again reaffirmed his desire to meet only with the employees. After Nielsen left without making any progress, the employees voted to go out on strike.

The picket line went up on July 22. The strikers demanded that the letters of termination be withdrawn, the suspensions be revoked, and that members of the Board of Directors of the PCC come to Hawaii for direct negotiations with the employees' bargaining committee, which included Anthony. On July 26 Hardisty and Nielsen again stated that they would be willing to talk with the employees, but they refused to bargain with Anthony. The stalemate continued in this posture. Picketing continued at several different entrances to the PCC. The six terminated employees were joined

on the picket line by other PCC employees, most of whom continued on the job during the strike, and some community people.

On July 31 Shipley notified Immigration officials that the six employees after August 5 would no longer be employed at the PCC and withdrew the PCC's support for the visa extensions. Some officials of the Hawaiian tourist industry, concerned about the effects of the strike, began acting as intermediaries in an effort to achieve a settlement of the strike. On August 12 Trade Wind Tours of Hawaii agreed to pay the four remaining discharged workers (two had voluntarily left Hawaii) $2000 each to cease the strike. This settlement was accepted and the strike ended. On August 29 an attorney representing the Fijians sent a letter to the PCC in which the four remaining discharged employees offered to return to work. On October 8 the PCC sent the employees a letter inviting them to discuss the possibility of reemployment.

Kini Suschnigg, another Fijian, was a student at BYU-H during the 1973-74 school year. She had a part-time secretarial job at the university and, although she rarely worked at the Center, she was an "on-call" employee there. She was active in the Fijian labor activities from the time of the dispute concerning Noa Naivi's termination in December 1973 and she engaged in picketing during the strike.

When she registered at the university for the fall term in 1974, she again sought part-time work. She was told by the university employment office that no office jobs were available, but that she should try the PCC. She met with several lower level supervisors there, including the chief and assistant chief of the Fijian village, both of whom told her that there was no work available. She appealed directly to Nielsen, who also told her that no work was available at the PCC, but did find her a job on campus. The job referred to by Nielsen was one at the university library, to which she had been previously referred and where she had been told that the job had already been filled. Despite the fact that the library job apparently now was open, Suschnigg refused to accept it.

The record indicates that others were hired to work in the Fijian village around the time Suschnigg was denied employment there. It was also established that Suschnigg had been living with her boyfriend in violation of church rules requiring chastity outside of marriage. This fact was known to those supervisors who refused to hire her at the PCC and is alleged to be the primary reason for their refusal to hire her.

## B. *The NLRB Proceedings*

An initial charge alleging that the PCC refused to bargain with the Fijian employees in violation of section 8(a)(5) and (1) of the Act was filed on July 23, 1974. On July 31 the PCC filed charges with the NLRB alleging that the Fijians were picketing for recognition without first filing a representation petition in violation of section 8(b)(7)(C). Both charges were subsequently withdrawn. On August 5 the charge was filed alleging that the six employees had been discriminatorily discharged in violation of sections 8(a)(1) and (3). An additional charge was filed on September 25 alleging that the refusal to hire Suschnigg was also unlawful under sections 8(a)(1) and (3). It is these two charges which, after consolidation, form the case now before us.

After a hearing the Administrative Law Judge (hereinafter ALJ) issued his decision in September 1975. He found that but for the Fijians' participation in protected, concerted activities the six employees would not have been discharged and there would have been no refusal to hire Suschnigg. He thus sustained the unfair labor practice charges; but he refused to recommend the usual remedies of reinstatement and back pay. He found that the six Fijians had been promised a *maximum* of two years employment, and reinstatement was inappropriate because this period ended in February 1975. Back pay for the six months left in the promised term was denied because he found that two employees had failed to make an unconditional offer to return to work and the other four had accepted a $2000 payment for terminating

the strike. Suschnigg was denied a job offer and back pay because she had refused an offer of equivalent employment.

Both the General Counsel and the PCC filed exceptions to the Administrative Law Judge's decision and proposed order; the General Counsel objected to the limited nature of the remedy and the PCC objected to the finding that both the termination and refusal to hire had been discriminatorily motivated. The Board in its order substantially expanded the remedy. It found that the employees had been promised a two year *minimum* term of employment, thus making reinstatement an appropriate remedy. The Board also ruled that, rather than back pay liability being contingent on the employees offering to return to work, it continues until the employer made an unconditional offer of reinstatement. The Board then found that the PCC, not having made such an offer to the discharged employees, was liable for back pay. Moreover, the private settlement payments did not automatically preclude a back pay remedy and only needed to be considered in the compliance proceeding in which the exact amount of the back pay liability was fixed. The Board, with one member dissenting, also found that the job offered Suschnigg at the university was not substantially equivalent to work at the PCC, therefore entitling her to an offer of employment and back pay. Finally, the Board broadened the cease and desist order entered against the PCC to forbid any interference with "formation of unions, collective bargaining or other mutual aid."

We shall first address the belatedly raised jurisdictional issue; thereafter, we shall turn to whether the Board's findings regarding PCC's unfair labor practices and its expanded remedies should be sustained.

II. *Jurisdiction*

The PCC assertion that the NLRB lacks jurisdiction over it because of its religious orientation rests on *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977), *cert. granted*, 434 U.S. 1061, 98 S.Ct. 1231, 55 L.Ed.2d 760 (1978), in which the Seventh Circuit refused to allow the NLRB to assert jurisdiction over lay teachers in parochial schools. The ALJ, however, made an explicit finding of jurisdiction to which the PCC did not object in the Board proceedings. Nor does the record of the hearing before the ALJ reflect any effort by the PCC to challenge the NLRB's jurisdiction. We conclude, therefore, that jurisdiction is being challenged by the PCC for the first time in this enforcement proceeding.

The National Labor Relations Act specifically provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Section 10(e); 29 U.S.C. § 160(e). The Supreme Court has stated that "[a]t least when the Board has not 'patently traveled outside the orbit of its authority', *Labor Board v. Cheney California Lumber Co.*, 327 U.S. 385, 388, [66 S.Ct. 553, 90 L.Ed. 739], our cases have uniformly held that in the absence of a showing within the statutory exception of 'extraordinary circumstances' the failure or neglect of the respondent to urge an objection in the Board's proceedings forecloses judicial consideration of the objection in enforcement proceedings." *NLRB v. Ochoa Fertilizer*, 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312 (1961).

■ In recognizing the authority of *Cheney* this court has distinguished between jurisdiction in the sense of "power to hear and determine the controversy" and jurisdiction in the sense of the power under the authority of the National Labor Relations Act to act under the particular circumstances which a labor relations controversy presents. *NLRB v. Pappas*, 203 F.2d 569, 571 (9th Cir. 1953). As to jurisdiction in the former sense it can be questioned at any time, while jurisdiction in the latter sense can be raised for the first time in an enforcement proceeding only under "exceptional circumstances."

■ The jurisdiction issue now being urged by PCC concerns "jurisdiction" in the

latter sense only. It can be raised only under "exceptional circumstances" which we hold do not exist in this case. A labor controversy exists between a church related commercial enterprise and certain of its employees. This is enough to bring the case within the "orbit" of the Act's authority. Jurisdiction in the first sense exists. The rendering of a decision by another circuit suggesting that perhaps jurisdiction in the second sense is lacking does not constitute an "exceptional circumstance" within the teaching of *Ochoa.* PCC and its counsel undoubtedly were aware of the lurking First Amendment issues and the necessity for a careful factual development before the Board upon which a conscientious disposition thereof would depend. Notwithstanding this, no effort was made to make such a disposition possible. It is now too late to ask for the opportunity to do so. Section 10(e) of the Act makes this clear.

### III. *Unfair Labor Practices*

#### A. *Discriminatory Discharges*

■ The ALJ found that the PCC violated sections 8(a)(1) and (3) because the six Fijian employees would not have been terminated but for their participation in protected concerted activities. The Board accepted this conclusion. We too must accept these factual conclusions if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ We have no trouble finding substantial evidence to support the Board's conclusion that these employees were engaged in protected concerted activities. The meetings held in December 1973 and again in early June 1974 were group efforts to find solutions to work-related problems. As such they fit easily within the definition of concerted activity developed by this circuit. *See Shelly & Anderson Furniture Mfg. Co., Inc. v. NLRB,* 497 F.2d 1200, 1204 (9th Cir. 1974); *Kaiser Engineers v. NLRB,* 538 F.2d 1379 (9th Cir. 1976).

■ The difficult issue presented here is whether the ALJ and the Board employed the proper legal standard when there exist multiple motives for a discharge. Several of our cases have said that the discriminatory motive must be the moving cause of the discharge. *Western Exterminator v. NLRB,* 565 F.2d 1114 (9th Cir. 1977); *NLRB v. West Coast Casket Co., Inc.,* 469 F.2d 871 (9th Cir. 1972); *NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45 (9th Cir. 1970). This is a different, and possibly more demanding, standard than the but-for approach of the ALJ and the Board. On the other hand, this court has indicated that it too, on occasion, employs the but-for approach. *See NLRB v. Klaue,* 523 F.2d 410 (9th Cir. 1975). These circumstances would give us pause were it not for the fact that our review of the record convinces us that any difference in the standard between that of "moving cause" and that employed by the ALJ and the Board is without operative significance. We reach this conclusion because on the record we find that the discriminatory purpose was the moving cause of, as well as the dominant motive behind, the discharge.

Direct evidence of motive rarely exists. Inferences from the evidence almost universally are the only way of determining motive. Here the inference that the PCC's dislike of the organizational activities was the dominant factor and moving cause in the discharge of the six employees emerges clearly and easily from the evidence. Concerted activity was actively resumed in early June; soon after, management began serious discussions about terminating the six employees. The timing of Shipley's memo discussing termination, apparently written right after an angry phone conversation with Anthony, suggests an improper motive. This conclusion is further strengthened by the close timing between the receipt by the management of the grievance letter on July 7 and the preparation of the termination notices.[2] Manage-

2. We find nothing in the record to indicate that the ALJ was wrong in finding that the termina-

tion decision was made in July, rather than in the spring as claimed by the PCC. In light of

ment's hostility to Anthony also suggests an improper motive.

On the other hand, we find little in the record to support the PCC's argument that the Board's conclusions lack the support of substantial evidence. The policy of terminating full-time employees in favor of part-time workers had not been generally instituted. The supply of part-time workers was not adequate and many full-time employees whose contracts ended were asked to stay on, at least on a month-to-month basis. Hence the PCC cannot be said to have a strict policy requiring termination of full-time workers. This showing regarding PCC's motive is too weak to refute our basic holding that the Board's findings of a violation of sections 8(a)(1) and (3) are supported by substantial evidence.

## B. *Discriminatory Refusal to Hire*

The Board also found that Suschnigg's participation in protected activities was the motivating factor in the PCC's refusal to hire her, and that this refusal was a violation of sections 8(a)(1) and (3).[3] The PCC argues that her unchaste behavior in violation of church rules was the reason for its refusal. The PCC argues further that, in light of the *Chicago Bishop* case, *supra*, we cannot evaluate the validity of a religiously based motive, but must accept it without question. Before the Board, however, the PCC argued only that the ALJ erred in not making a finding that the violation of church rules was the cause of the refusal to hire Suschnigg. PCC's *Chicago Bishop* argument can not be raised here for the first time. Our holding in Part II forecloses this possibility.

██ Turning to the issue which is properly before us, we think that there is substantial evidence to support the finding that Suschnigg's participation in the strike was the moving cause of, and dominant motive

behind, the PCC's refusal to hire her. We acknowledge that her violation of church rules and her apparent preference for clerical work may have played some role in the decision not to hire her. However, the strength of the motive generated by her violation of church rules appears weak because she was offered a job at a location where the same rules are in effect, the BYU-H campus. The Fijian village at the PCC was short-handed at the time Suschnigg was told there were no jobs available. This misrepresentation suggests that the PCC was not primarily concerned with her job preference. Thus, the PCC's proper motives appear not to have been controlling or even strong.

On the other hand, the inference that the dominant reason for the refusal to hire Suschnigg was her participation in the strike is strong. Suschnigg was actively involved in the concerted activities prior to the strike, serving as a secretary to Anthony, as well as one of the major participants in the strike itself. This supports a reasonable inference that she would continue with these organizational efforts as an employee and that the PCC would be hostile to such a potential employee. Thus, although the evidence supporting the finding of discriminatory refusal to hire is less compelling than in the terminations, we hold there was substantial evidence to support an inference that the dominant motive and moving cause for the refusal was Suschnigg's previous participation in concerted activities.

## IV. *Remedies*

### A. *Reinstatement*

The Board overruled the ALJ's recommendation that the six terminated employees not be reinstated. It based its order of reinstatement on its factual finding that the employees had been offered a two year *minimum* term of employment. The ALJ,

---

our acceptance of the July date, we do not have to decide whether there was a continuing pattern of concerted activity from December on. The activities in June are legally and factually sufficient to support the finding that they were the reason for the discharge.

**3.** It is established that a discriminatory refusal to hire can be as much a violation of section 8(a)(3) as a discriminatory termination. *Phelps-Dodge v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817 (2nd Cir. 1975).

on the other hand, had found that the Fijians had been promised only a two year *maximum* term. We agree that the question of whether reinstatement is an appropriate remedy in this case turns on a factual finding as to the length of employment promised because, if the employment was due to expire in six months, the Board's reinstatement remedy would have the impermissible effect of turning a temporary job into a permanent one. *Cf. Armstrong Rubber Co. v. NLRB*, 511 F.2d 741 (5th Cir. 1975); *The Cavern Supply Company, Inc.*, 187 NLRB No. 25.

■ Since there was no written document specifying the total length of the employment promised this group, the determination of the length of the term turns on an evaluation of the credibility of the witnesses at the hearing. In this case the findings of the Board and the ALJ are in conflict. While we must accept the Board's finding if it is supported by substantial evidence, the ALJ's contrary factual conclusions "assume added importance because [he] 'has the responsibility of evaluating the credibility of witnesses and the weight to be given their testimony.'" *Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 n. 3 (9th Cir. 1977). *Cf. Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–9, 1084–7 (9th Cir. 1977).

■ After reviewing the Board's finding that a two year *minimum* term of employment was promised, together with the contrary finding by the ALJ, we are unable to find substantial evidence to support the finding of the Board. At the hearing several Fijian employees testified that they had been promised orally by Mr. Hardisty at the time they were originally recruited a minimum of two years employment if they performed satisfactorily. At the time of the strike, however, the Fijian employees were only demanding a six month extension of their contract to fill out the two year term. The ALJ was correct in considering the assertion at the time of the strike more probative than later testimony at the hearing. Further, the acknowledged missionary goals of the Church of Jesus Christ of Latter Day Saints are inconsistent with a policy of bringing Polynesian employees to the PCC for a minimum term. Bringing in employees from Polynesia for a fixed period during which they might be persuaded to join the church, and at the expiration of which they would return to their own countries as missionaries for the church, is more in keeping with church philosophy. Although some Polynesian employees did stay longer, often as students and part-time workers, though occasionally as full-time employees, these were clearly the exception rather than the rule. Under these circumstances we cannot say that the Board's finding is supported by substantial evidence. Therefore, we refuse to enforce the reinstatement remedy ordered by the Board.

### B. Back Pay

■ In its back pay award the Board ruled that when employees are discriminatorily discharged, the back pay obligation normally runs until the employer makes an unconditional offer of reinstatement; as a consequence, the employees are not obliged to offer to return to work. *See* CCH Labor Law Reporter § 4755. We agree. When the employer is at fault, we think he should be required to make the first move toward reestablishment of the employment relationship. *See NLRB v. Southern Greyhound Lines*, 426 F.2d 1299 (5th Cir. 1970).

■ The Board found that the PCC never made an unconditional offer of reinstatement to the discharged employees. Substantial evidence supports this finding. The evidence indicates that the PCC invited the discharged employees to come in and reapply for employment. That is not an unconditional offer of reinstatement. *Compare NLRB v. State Stove & Mfg. Co.*, 403 F.2d 656 (6th Cir. 1968) and *Kenston Trucking Co., Inc. v. NLRB*, 544 F.2d 1165 (2d Cir. 1976). Therefore, PCC has a back pay liability to the six discharged employees. This liability, however, is limited to six months because these employees had only six months left of the two year maximum term of their employment.

This liability is not automatically discharged by the strikers' acceptance of $2000 payments to end the strike. We reject a flat rule which would make acceptance of a strike settlement payment a bar to a later back pay award. The Board, however, should consider the effect of the strike settlement payment when it computes the amount of the back pay award. Normally, the Board's remedial order merely requires that the employees be made whole for any loss of earnings or other monetary losses suffered by them as a result of the discrimination. The Board does not ordinarily calculate the exact amount of the back pay award until the order has been enforced. *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131 (7th Cir.), *cert. denied*, 419 U.S. 838, 96 S.Ct. 66, 42 L.Ed.2d 65 (1974). The Board appears to be proceeding in this manner in this case. In due course the Board will calculate the back pay due. The PCC can seek review in this court if it objects to the amount calculated by the Board.

### C. *Remedy Applicable to Suschnigg*

The Board, with one member dissenting, ordered that Suschnigg be offered a job at the PCC and that she be made whole for any loss of earnings suffered as a result of the discrimination. The PCC challenges this remedy, arguing that Suschnigg's refusal to accept the offer of an office job on the BYU-H campus precludes such relief. We disagree. The jobs of office worker and cultural demonstrator are not so substantially equivalent that the office job offer can fulfill the PCC's reinstatement responsibility and release it from back pay liability. *Cf. NLRB v. Huntington Hospital, Inc.*, 550 F.2d 921, 924 (4th Cir. 1977); *Fredeman's Calcasieu Locks Shipyard*, 206 NLRB No. 104.

The Board has construed "substantially equivalent" narrowly, requiring that the jobs utilize similar skills, receive similar

pay, have similar working conditions and the like. *Cf. NLRB v. Aycock*, 377 F.2d 81, 84 (5th Cir. 1967); *Ramona's Mexican Food Products*, 203 NLRB No. 102. The office job offered Suschnigg requires very different skills and has different working conditions from a job as a cultural demonstrator. The fact that Suschnigg had expressed a preference for office work, however, might suggest that the two jobs should be viewed as substantially equivalent. Nonetheless, the Board here specifically found that "the Employer was motivated to find Suschnigg a position at the University in order to prevent her from exercising her Section 7 rights as an employee at the Cultural Center." 222 NLRB No. 172. Thus, the Board's refusal to find that the two jobs are equivalent is consistent with its duty to promote the goals of the Act. *Cf. Trustees of Boston University v. NLRB*, 548 F.2d 391 (1st Cir. 1977). In view of the Board's broad power to fashion appropriate remedies, we will enforce the remedial order relating to Suschnigg. *Cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).[4]

### D. *Cease and Desist Order*

The Board also expanded the cease and desist order recommended by the ALJ to include a requirement that the PCC cease and desist from any violation of section 7 of the National Labor Relations Act. The PCC argues that this order is impermissibly broad.

Courts have generally upheld such orders when they were found to be justified in view of the violations committed by an employer. *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 827 (2d Cir. 1975). So long as the order is limited to acts which are "like or related" to the acts which gave rise to the initial violation, it is permissible. *NLRB v. Express Publishing Co.*, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941). We

---

4. While we enforce both the reinstatement and the back pay order, we note that in computing back pay the Board is required to consider the employee's efforts to mitigate his financial losses. *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 822 n. 3 (2nd Cir. 1975). Thus, the Board should consider Suschnigg's refusal to accept the office job when it computes the back pay due her.

have no trouble in enforcing the order challenged here. The PCC's violations of the organizational rights of its employees reflect a general anti-union attitude. A more limited cease and desist order might allow the PCC to express this hostility in other ways. Inasmuch as the company has already generally violated section 7, this order clearly relates to "like or related" acts.

## V. Defense of Racial Discrimination by the Fijians

The PCC argues as an affirmative defense that the Fijian employees discriminated on the basis of race in their concerted activities and should therefore be denied any protection of the National Labor Relations Act. The PCC argues that the Fijians discriminated against both whites and other Polynesian ethnic groups. The ALJ found that the Fijians had not discriminated against anyone and this finding was adopted by the Board.

█ Substantial evidence supports this finding. Some of the picket signs did characterize the issue as Brown Power vs. White Power. We think this merely reflects an attempt, similar to actions often employed by the young and old of all colors, to enlist a glamorous fantasy in the mundane effort of winning a strike. This conclusion is supported by the fact that in the group supporting the strike were whites. The ALJ also found that there was no evidence that Anthony and his supporters would refuse to represent PCC employees of differing ethnic backgrounds. The situation at hand involved only the Fijians. Other employees were not directly faced with these problems at that time. As such, action by this small group to seek adjustment of grievances was entirely appropriate. *See NLRB v. Tanner Motor Livery, Ltd.*, 419 F.2d 216 (9th Cir. 1969). While there may have been some tension between some of the Fijians and some members of other ethnic groups, there was no showing

5. Since we find no discrimination we do not have to deal with the issue of when racial discrimination by a labor group will foreclose NLRB remedial action which favors that group.

of active racial discrimination. Substantial evidence supports the finding that there was no discrimination on the basis of either race or ethnic background by the Fijians.[5]

We therefore partially enforce the Board's order, with the limitations that the six discharged employees will not be entitled to reinstatement, but only to back pay for a six month period.

*Compare NLRB v. Mansion House Center Management Corp.*, 473 F.2d 471 (8th Cir. 1973) *with NLRB v. Mangurian's Inc.*, 566 F.2d 463 (5th Cir. 1978).