**ST. ELIZABETH COMMUNITY HOSPITAL, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Hospital and Institutional Workers' Local 250, SEIU, AFL–CIO, Intervenor.**

**No. 78–2959.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 1980.

Decided Aug. 21, 1980.

J. Mark Montobbio, San Francisco, Cal., for petitioner.

Lynne Deitch, Washington, D. C., argued, for respondent.

David Rosenfeld, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for intervenor.

Before SNEED, PREGERSON, and ALARCON, Circuit Judges.

PER CURIAM:

This case arose on a petition for review and cross-application for enforcement of an order of the NLRB requiring the St. Elizabeth Community Hospital, a charitable institution owned and operated by a religious order, the Sisters of Mercy, to enter into collective bargaining with the Hospital and Institutional Workers, Local 250, SEIU, AFL–CIO (Union). The Board found that the hospital had violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain with the Union or to provide information relevant to collective bargaining.

We find that the Hospital's First Amendment challenge to the Board's jurisdiction was timely raised, and we remand to the Board for further consideration in light of *NLRB v. Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

## FACTS

In March 1977, the Union filed petitions with the Board seeking to represent four groups of employees of the Hospital. A representation hearing was held on March 28, 1977, at which the focus was on the status of different hospital employees. The Hospital did not question the Board's jurisdiction at that hearing. The Board's Regional Director, on May 20, 1977, determined the status of the various employees, defined four collective bargaining units and directed that an election be held. On June 1, the Hospital requested the Board to review the Regional Director's determinations regarding the eligibility to vote of several employees. The Board, by a telegraphic order, denied review on June 15, except as to those employees who the Hospital had contended were supervisors. As to these persons the Board's telegraphic order directed that they be permitted to vote, subject to challenge, and that their eligibility to vote could be determined after the election.

The next day, June 16, the election was held with the result that three of the bargaining units rejected union representation, while the fourth, consisting of service and maintenance employees, cast 43 votes for and 35 votes against union representation, with 14 votes being challenged. Objections to the conduct of the election were filed by the Hospital alleging that Union observers had improperly kept a voter list and that the Board's failure to make a more prompt final ruling on the supervisory status of the three head nurses and supply supervisor had impeded the Hospital's campaign efforts and misled employees as to their supervisors' views.

The Regional Director conducted an *ex parte* investigation and thereafter, on August 30, rendered a supplemental decision overruling these objections and disposing of the challenges to the votes of particular employees. The Hospital sought review of this decision by the Board on September 8, arguing for the first time in this proceeding that the Board lacked jurisdiction on First Amendment grounds. By a telegraphic order of November 20, the Board denied review. It also deferred consideration of the challenge to the central service supply supervisor's vote pending a revised tally of the ballots. This revised tally showed 45 votes for union representation, 40 votes against, and 3 undetermined challenged ballots. The Union was certified on December 1.

The Hospital refused to bargain and on January 6, 1978, a complaint was filed charging the Hospital with unfair labor practices under §§ 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5) (1976). As an affirmative defense in its January 13th answer to the unfair labor practice complaint, the Hospital again raised the issue of the Board's lack of jurisdiction on First Amendment grounds. In a Decision and Order dated August 28, 1978, the Board granted a motion of the General Counsel for summary judgment. In that decision, the Board dismissed the Hospital's defense on the ground that, "All issues raised by [the Hospital] . . . were or could have been litigated in the prior representation proceeding, and [the Hospital] does not offer . . . any newly discovered or previously unavailable evidence, nor does it

allege that any special circumstances exist herein which would require the Board," to find to the contrary. Thus the Board refused to address the merits of the Hospital's defense on the ground that the Hospital failed to claim that it had uncovered new evidence, unavailable at the time of the proceedings before the Regional Director. The Board therefore ordered the Hospital to bargain with the Union and to furnish, upon request by the Union, information necessary for bargaining purposes. The Hospital petitioned for review of the Board's order and the Board applied for enforcement. The Union's intervention completes the roster of parties before us.

## JURISDICTION

The Board asserts that we should not consider the Hospital's First Amendment challenge to its jurisdiction because of the Hospital's failure to raise the issue "until late in the representation proceedings." Board's Brief, p. 7. It relies on *Polynesian Cultural Center, Inc. v. NLRB*, 582 F.2d 467, 472–73 (9th Cir. 1978). This reliance is misplaced. Unlike the employer in *Polynesian Cultural Center*, the Hospital in the instant case raised the First Amendment issue in the representation proceedings before the Board and did not defer its challenge to the enforcement proceedings. We think this is sufficient to require that the issue be considered by the Board although we acknowledge that the challenge was not made as promptly as it might have been.

The Hospital argues that the difficult and sensitive First Amendment questions described in *NLRB v. Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), are present in this case and require us to hold that the Board's failure to exempt the Hospital from the NLRA violates the First Amendment. Since the facts relevant to a determination of these issues were not developed by the Board, the case will be remanded to the Board for further proceedings on the question of the Board's jurisdiction in light of the Supreme Court's opinion in *Catholic Bishop*. For us to deal with the issue before the facts of this case have been

fully established would amount to the giving of an advisory opinion which we must decline to do.

Since the jurisdictional issue has not yet been settled, it would not be appropriate for us to address the representation issues. The question of the propriety of the Board's certification of the Union depends, of course, upon whether the Board had jurisdiction to issue such certification.

Remanded.

SNEED, Circuit Judge (dissenting):

I respectfully dissent.

The Hospital raised its First Amendment challenge in timely fashion during the representation proceedings and chose to stand on the record it had made. The Hospital's request for review of the Regional Director's supplemental decision described the religious character of the Hospital and contended that the Board's assertion of jurisdiction violated the Free Exercise and Establishment Clauses. Significantly, the Hospital did not request an opportunity to develop further facts with respect to the issue. Although the Board's two-sentence order denying review did not specifically discuss any of the arguments advanced by the Hospital, it is evident that in denying review the Board rejected the First Amendment challenge. The jurisdictional issue was raised again in the unfair labor practice proceedings but, as the Board pointed out, the Hospital did not offer any newly discovered or previously unavailable evidence and did not allege any specific circumstances designed to strengthen its challenge. Under these circumstances we have a duty to decide the case on the record made by the Hospital.

Moreover, I seriously doubt that the Hospital can establish a record that would justify ousting the Board's jurisdiction. Short of establishing that a substantial part of the treatment provided by the Hospital consisted of "faith healing," unaugmented by the usual procedures of a modern hospital, any record that the Hospital might establish is very likely to present to the Board and the court issues not different material-

ly from that presently before us. Therefore, I would decide this case now. My belief that this case is presently ripe for decision is in the final analysis shaped by my perception of the First Amendment as presently interpreted by the Supreme Court. Perhaps it will serve some useful purpose to set forth this perception. Although I conclude that the Board has jurisdiction in this case and that a remand is useless, I shall not extend this dissent by dealing with the merits of the substantive labor law issues of which the Hospital sought review. These will, I am certain, be decided in due course.

The Hospital's First Amendment challenge perhaps would succeed had the Supreme Court in the years since *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), fashioned the "wall of separation between Church and State" to which Justice Black referred in his majority opinion in that case. 330 U.S. at 16, 67 S.Ct. at 512. This has not been the case, however. Whether one approaches the issue from the standpoint of the Establishment Clause or the Free Exercise Clause the Supreme Court teaches that accommodation more accurately describes the relationship between church and state than does the metaphor "wall of separation."

Thus, when the focus is upon the Establishment Clause, as in the Court's recent decision in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), a three part test is employed to determine whether that Clause has been transgressed. In behalf of a plurality of the Court, Mr. Justice Blackmun wrote:

> "In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion." *Id.* at 236, 97 S.Ct. at 2599.

The terms and clauses "secular," "principal or primary," "neither advances nor inhibits," and "excessive government entanglement" clearly suggest the goals of accommodation and coexistence.

Similar goals emerge from the tests employed when the focus is upon the Free Exercise Clause. The Court, in evaluating Pennsylvania's Sunday-closing law, fashioned the following test for determining whether state regulation was valid:

> "But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose the burden." *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961).

The Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), found the state laws in each instance imposed an impermissibly heavy burden on the free exercise by individuals of their religious beliefs unsupported by any compelling state interest. These rubrics unmistakably suggest the necessity of balancing the interests of the state against those seeking relief from its burdens on religious grounds. The notions of accommodation and coexistence thus emerge here also.

Admittedly the terms "accommodation" and "coexistence" provide little clue to understanding the nature and essence of the "accommodation" and "coexistence" required by the First Amendment. This is not surprising. Much of the late and post-Roman history of the Western world reflects a search for the proper relationship between the affairs of the state and those of the spirit. The balance struck in one century proved unworkable in another. Justice Black in *Everson* sketched the history of that portion of this search most directly applicable to adoption by this Nation during its infancy of the First Amendment. 330 U.S. at 8–15, 67 S.Ct. at 507–511. Clearly the Founding Fathers desired to strike a balance quite different from that their fathers and forefathers had experienced. Most no doubt wanted neither a Godless people nor a religious state. Jus-

tice Black reasonably approximated the essence of their new balance when in *Everson* he observed:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*" 330 U.S. at 15–16, 67 S.Ct. at 511.

These words, when understood as descriptive of issues that inflamed society prior to the Constitution's adoption, which is the way in which Justice Black appears to have used them, set forth precisely the manner in which they were resolved by the First Amendment. No longer could they inflame the people. They were settled. A new equilibrium was created between church and state. Maintenance of the new equilibrium, however, requires responses to new problems, the nature of which should be congruent with the general design of the new equilibrium. Can children be bused to parochial schools? Can free books be given by the states to such children? Can a member of the Seventh-Day Adventist Church be deprived of unemployment compensation benefits because of an unwillingness to work on Saturday? These and many more demand attention in part because the Nation asks "What is the answer that is most compatible with the First Amendment's resolution of the critical eighteenth century issues of church-state relations?"

Compatibility becomes more difficult to perceive as the roles of religion and the state are transformed from their eighteenth century pattern to that of the present day. A "wall" between a state, which exists only to provide the basic services dictated by the necessity to preserve order, and the churches within its boundaries is easier to maintain (although fire and police protection of church property requires at least momentary reflection) than is one between a pervasively penetrating welfare state and the religious beliefs, practices, and organizations of a people perhaps once more commencing a search in many directions for religious truth. *See* Note, *Toward A Constitutional Definition of Religion*, 91 Harv. L.Rev. 1956 (1978), *passim.* In the latter circumstances, the futility of a "wall" must be recognized. On the other hand, a betrayal of the Founding Fathers is unthinkable. The accommodations chosen, therefore, must neither render the people Godless nor make the state God.

The Supreme Court has established the markers by which one must be guided. This case requires that the initial focus be upon the Free Exercise Clause. Applying the markers set forth in *Braunfeld, Sherbert,* and *Yoder,* it is undeniable that the National Labor Relations Act, as amended by 1974 legislation which eliminated the exemption for nonprofit hospitals, is a general law within the power of Congress to enact. Its constitutional foundation is the Commerce Power. It is designed to serve a secular goal, *viz.,* the improvement of labor-management relations. It imposes no burden on religious observances or activities.

Of course, it can be asserted that the secular goal of improving labor-management relations could be achieved substantially without subjecting church-owned and operated hospitals to the Act. This assertion leads irresistably to the Establishment Clause. Would the exclusion of church-owned and operated hospitals from the Act's reach serve to advance a particular religious organization impermissibly? I am inclined to think the question presents a substantial issue.

Returning to the three part test of *Wolman v. Walter, supra*, the purpose of the exclusion of church owned and operated hospitals might well be considered to be tainted by sectarian concerns and arguably its primary effect would be to advance a particular religious organization. This tentative response reflects the "double-barreled dilemma" of which Justice Stewart spoke in his concurring in the result opinion in *Sherbert*. 374 U.S. at 413–17, 83 S.Ct. at 1798–1801. In any event, Establishment Clause considerations, as required by the Supreme Court's interpretation of that clause, should retard any impulse to require exclusion of the Hospital in this case on Free Exercise grounds. Thus, an issue thought to involve one of the two great Clauses turns out also to involve the other. Standing in the wings as the Free Exercise Clause takes the stage is the Establishment Clause ready to appear and speak its part advising restraint. Furthermore, a reversal of the roles, with the Establishment Clause on the stage, presents few difficulties to the actors. In that case it is the Free Exercise Clause that in due course urges restraint.

The Hospital argues that *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), requires a holding that the Board lacks jurisdiction in this case. This is not so. In the first place, *Catholic Bishop* was decided on statutory grounds. The Court held that, in the absence of an affirmative intention on the part of Congress reflected in the statute or legislative history to extend jurisdiction to church-operated schools, it would not construe the NLRA to apply to such schools. Its refusal to apply the NLRA to church-operated schools enabled it to avoid difficult and sensitive First Amendment questions. This course is not open in this case.

The legislative history of the 1974 amendment to the NLRA, Pub.L. 93–360, § 1(a), 88 Stat. 395, which eliminated a statutory exemption from the Board's jurisdiction of nonprofit hospitals, reflects an affirmative intention to subject church-owned and operated hospitals to that jurisdiction. The Senate rejected an amendment to retain a limited exemption for church-sponsored hospitals. *See* Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 93rd Cong., 2d Sess., *Legislative History of the Coverage of Nonprofit Hospitals Under the National Labor Relations Act, 1974*. Senator Cranston, floor manager of the Senate Committee Bill and an opponent of the proposed religious exemption, argued that subjecting church-sponsored hospitals would not affect religious teaching or interpretation and was necessary to protect employees who are a part of the labor pool from which both non-sectarian and sectarian hospitals draw their employees. *Id.* at 133–34. His view prevailed. No clearer showing of an affirmative intent is needed.

The Hospital does not question this. In effect it says that the difficult and sensitive First Amendment questions described in *Catholic Bishop* are present in this case and require that it be exempt from the NLRA. The Supreme Court in *Catholic Bishop* mentioned that the exercise by the Board of its jurisdiction in parochial schools could require the Board to determine whether certain practices which might otherwise be unfair labor practices were mandated by religious doctrine, whether reliance on such doctrines was in good faith, and whether such doctrines limited the usual meaning of "terms and conditions of employment." 440 U.S. at 502–503, 99 S.Ct. at 1320. The Court also observed that mandatory collective bargaining would reduce the autonomy of clergy-administrators otherwise vested in them by church authority and that the very process of inquiry into the operation of parochial schools was intrusive on an activity substantially religious in character. *Id.* at 503, 99 S.Ct. at 1320. Finally, the Court stated that "[t]he church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school." *Id.* at 504, 99 S.Ct. at 1321.

These are indeed difficult and sensitive First Amendment issues. They do not, however, exist in this case to a significant extent. There is no demonstration, nor is one likely to be made within the context of the operation of an ordinary hospital, that

religious doctrine in any way limits labor practices so as to compel an unfair labor practice or to alter what would otherwise be the meaning of "terms and conditions of employment." Lacking also is any showing of the manner in which collective bargaining might reduce the autonomy of the several members of the Sisters of Mercy who sit on the Hospital's governing board. Admittedly, application of the NLRA will result in an intrusion on the Hospital's activities, but this alone impairs no sectarian objective.

The Hospital urges that the mere possibility of impairment of sectarian objectives is enough to deprive the Board of jurisdiction. This is incorrect. The possibility of impairment must be more substantial than one based on dark speculation and forboding fancy. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), is not to the contrary. Extensive findings were made by the district court in that case regarding the religious character of the Rhode Island parochial schools. No equivalent record exists here, nor in my view is it likely that such a record can be made in this case.

Under these circumstances I would hold that the Board's jurisdiction exists.