TRESSLER LUTHERAN HOME FOR CHILDREN, t/a Frostburg Village of Allegany County Nursing Home, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–1302.

United States Court of Appeals, Third Circuit.

Argued March 3, 1982.

Decided April 26, 1982.

Rehearing and Rehearing In Banc July 16, 1982.

---

**2.** *See,* —— U.S. at ——, 102 S.Ct. at 1140; *Cohn v. G. D. Searle & Co.*, 447 F.Supp. 903, 911 n.17 (D.N.J.1978).

Ronald M. Katzman (argued), Thomas E. Brenner, Goldberg, Evans & Katzman, Harrisburg, Pa., for petitioner.

Eric Moskowitz (argued), W. Christian Schumann, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D.C., for respondent.

Before HUNTER, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A nursing home affiliated with the Lutheran Church contends that application of the National Labor Relations Act to it would be a violation of the free exercise clause of the First Amendment. Relying on its own precedents, which cited specific statutory authorization, the Board rejected the jurisdictional challenge. The employer also objected to various union campaign activities, which it contended tainted a representation election at the home. We conclude that the First Amendment defense is not applicable in the circumstances of this case, and that the Board's bargaining order must be enforced.

After a majority of the employees voted in a Board election for representation by a union, the nursing home employer filed objections to the union's campaign activities. The Regional Director investigated the complaints, found them insubstantial, and certified the union as bargaining representative. When the employer refused to bargain, the union filed unfair labor practice charges and the Board entered summary judgment against the home.

Tressler Lutheran Home for Children operates a facility known as the Frostburg Village of Allegany County Nursing Home in Frostburg, Maryland. Tressler's Board of Directors is elected by the Central Pennsylvania and Maryland Synods of the Lutheran Church in America. Tressler is a non-profit entity dedicated to charitable work under the auspices of the Church.

The Home provides health care to individuals regardless of religious affiliation and its employees are not limited to adherents of the Lutheran Church. Operation of the Home is in furtherance of Lutheran practice in implementing the biblical corporate

works of mercy. All employees are oriented in the Christian doctrine that, in caring for "one of these, the least of My brethren, you did it unto Me." Other than an orientation in this general philosophy, there is no evidence that any specific religious indoctrination of employees or patients occurs.

The Home enjoys tax exempt status as a religious organization. At one time it received income from the Lutheran Church, but its operating funds currently come from the patients, the majority of whom are eligible for Medicare and Medicaid. CETA funds are used to pay several employees.

The Home contested the jurisdiction of the Board at every stage of the proceedings on First Amendment grounds. The Board, however, following its rulings in *Mid American Health Services, Inc.*, 247 N.L.R.B. 752 (1980), and *Bon Secours Hospital, Inc.*, 248 N.L.R.B. 115 (1980), rejected the Home's objections. The Board had expressed doubt about its authority to adjudicate constitutional issues in these earlier cases, and instead relied upon specific authorization in the health care institution amendments to the Act. As the Board saw it, the Home's operations were essentially secular in nature, and were similar to those institutions that had no religious affiliations.

The Home's complaints about the pre-election activities included objections to a letter allegedly containing unspecified misrepresentations sent by the union two days before the balloting. Other literature the union circulated included questionnaires addressed to the employees on subjects to be contained in a collective bargaining agreement. Leaflets and letters discussed matters in controversy such as union dues, and accused the employer of having "continually lied and misrepresented the truth."

The Board rejected some challenges as being unsupported. Others were rejected as being matters that could be expected in normal campaigning. In addition, the employer had the opportunity to answer the material before the election, and did so in most instances.

Affidavits by various employees to the effect that they had been verbally abused by pro-union employees were also filed. Some stated that employees were told that if they did not vote for the union, its supporters would make life miserable for them. In another incident, racist remarks were made. The Board, however, found that there was no evidence that the speakers were members of the organizing committee or that the union had authorized the statements.

Initially, the Board authorized a bargaining unit consisting of service and maintenance employees, nursing and physiotherapy assistants, clerks, orderlies, and dietary, housekeeping and laundry employees. In later proceedings, licensed practical nurses were included in the unit, despite the employer's contention that they were supervisors. The Home petitioned for review and the Board filed a cross-application for enforcement.

Tressler's principal argument on appeal is that the Board's assumption of jurisdiction violates both the establishment and free exercise clauses of the First Amendment. According to Tressler, collective bargaining would impede its religious mission because the process of inquiry into aspects of collective bargaining and resolution of unfair labor practice charges itself would create an improper entanglement between church and state. The Board, however, asserts that Tressler's services—providing health care to those in need—are humanitarian rather than religious in nature, and that the Home does not engage in religious training or indoctrination.

We agree with the Board that it has no authority to rule on constitutional questions, *see Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); *Johnson v. Robison*, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974); *Oestereich v. Selective Service Board*, 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968), (Harlan, J., concurring), and that the issue here is one for the courts. We begin by reviewing a case where the Supreme Court deliberately avoided the constitutional issue raised here.

In *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Court held that the Board exceeded its jurisdiction when it ordered the Bishop of Chicago to engage in collective bargaining with lay teachers in the diocesan high schools. The Court was able to rely upon statutory interpretation since it found no evidence of Congressional intent to include parochial schools within the scope of the Act. *Id.* at 505–06, 99 S.Ct. at 1321–22. But the Court did note the difficult questions of state entanglement which would arise if such religious institutions had been included. *Id.* at 499–501, 99 S.Ct. at 1318–19.

Fear of governmental entanglement was based on two potential sources of conflict—actions labeled as unfair labor practices were said to be mandated by religious creed, and topics of mandatory bargaining would "implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions." *Id.* at 503, 99 S.Ct. at 1320. The Court emphasized that "[p]arochial schools involve substantial religious activity and purpose," and that their employment relationships differ from those in nonreligious schools. *Id.* at 503–04, 99 S.Ct. at 1320–21, *quoting Lemon v. Kurtzman*, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971).

A better understanding of the issues here is seen by assessing the differences between the case at hand and *Catholic Bishop*. Unlike that case, here there is an express Congressional pronouncement on the jurisdiction of the Board over religious hospitals and nursing homes. In 1974, the Act was amended to include non-profit hospitals within its scope. 29 U.S.C. § 152 (1976). During the debate on the legislation, Senator Ervin offered an amendment which would have exempted hospitals operated by religious organizations. 120 Cong.Rec. 12950 (1974). In support of his proposal, the Senator discussed the position of the Seventh Day Adventists that their hospitals were one of the "evangelistic tools" the church used to accomplish its religious mission. A spokesman maintained that recognition of a labor union in a church-owned hospital would violate the religious tenets of Seventh Day Adventists. 120 Cong.Rec. 12950–55.

In opposition, Senator Cranston noted that religiously-affiliated hospitals were supported by a variety of governmental subsidies and grants, that their health-care operations were the same as non-religious institutions, and that both drew on the same manpower pool. 120 Cong.Rec. 12955–7. Upon consideration, the Senate rejected the amendment.

The primary function of a nursing home is care of the elderly and infirm. We recognize that the religious atmosphere and motivation at the Tressler Home are beneficial to the well-being of the patients, but the actual physical care given is comparable to that furnished by secular facilities. In that sense the religious atmosphere is secondary to that of direct patient care. The raison d'etre of parochial schools, however, is the teaching of religious doctrine. Thus, the "critical and unique role of the teacher in fulfilling the mission of a church-operated school," as found in *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319 differs from the main function of those who give personal attention to the elderly and infirm. Nor do we have the situation in Tressler of clergy-administrators operating the nursing home, a situation which would present a greater opportunity for religiously-based conflicts in labor negotiations. Although the Home's Board is elected by the Lutheran Church, there is no indication that the directors, or the other administrators, belong to that faith.

Moreover, by its citations to such cases as *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); and *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2953, 53 L.Ed.2d 714 (1977), the Court in *Catholic Bishop* suggests that if the risk of governmental entanglement forbids the state from aiding a parochial school in its educational activities on establishment grounds, the free exercise clause pre-

vents the government from intruding on the school's educational work. As mentioned earlier, the Tressler Home was able to pay some of its employees through the use of federal funds. The record does not disclose whether governmental subsidies or grants were used in the construction of the nursing home, although they are often available for health care institutions.

*Catholic Bishop* is instructive, although as Tressler concedes, it is not controlling, because unlike the case of parochial schools, there is legislative sanction for Board jurisdiction over religious nursing homes. In this case, therefore, the constitutional issue is presented.

In *United States v. Lee*, —— U.S. ——, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the Supreme Court, noting that not all burdens on religion are unconstitutional, formulated a three-part test. The first inquiry is whether the obligation imposed interferes with the free exercise right. The second question is whether the state has justified the limitation on religious liberty by showing that it is essential to an overriding governmental interest. The final question is whether accommodating the religious belief would unduly interfere with fulfillment of the governmental interest. *Id.* —— U.S. at ——, 102 S.Ct. at 1056.

As we read *Lee*, there must be a balancing of these considerations. In that case, the court held that the government's interest in collecting taxes overrode the Amish religious objection to withholding social security taxes.

We begin with the preliminary inquiry into whether there is support for the claim that Tressler's free exercise rights have been impaired. The record on this phase of the case is brief. Unlike the Seventh Day Adventist employer who insisted that it could not collectively bargain with a union in *Cap Santa Vue, Inc. v. NLRB*, 424 F.2d 883 (D.C.Cir.1970), and *Mid American Health Services, Inc., supra*, there is no evidence that the Lutheran religion proscribes such conduct. Tressler does argue, however, that a union interpretation of a discharge for "cause" under the terms of a collective bargaining agreement could well differ from one based on the Home's desire to employ those whose performance of duty reflects a religiously inspired "work of mercy." Similar conflicts may be anticipated in other aspects of working conditions as well.

No specific religion-based conflicts have emerged as yet, however, so the question is whether the assertion of jurisdiction by the Board through its order to bargain, without more, violates the First Amendment. The Home asserts that there is an infringement insofar as it would lose its autonomy in the management and operation of the institution.[1]

That is a valid concern, but as we see it, the religious interest at stake here is less specific and less in confrontation with governmental policy than was true in *Lee*. In the case at hand, the governmental interest is the enforcement of the Act's labor policy providing employees with a right to the benefits of collective bargaining. While this interest may not be as strong as insuring mandatory participation in the social security system, it does represent the Congressional solution to a national problem.

Additionally, in this case the accommodation aspects appear more favorable. Although recognition of the union will impose some constraints upon Tressler's operation of the Home, direct religious conflict is neither inevitable nor probable. Moreover, as the Court observed in *Lee*,

1. For a discussion on religious autonomy in conflict with governmental regulations, *see* Laycock, "Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy," 81 Colum.L.Rev. 1373 (1981), and an earlier work by the same author, Laycock, "Civil Rights and Civil Liberties," 54 Chi.-Kent L.Rev. 390 (1974).

Other literature on the subject includes Pepper, "*Reynolds, Yoder*, and Beyond: Alternatives for the Free Exercise Clause, 1981 Utah L.Rev. 309; Note, "The Boundaries of a Church's First Amendment Rights as an Employer," 31 Case W.Res.L.Rev. 363 (1981); Adams & Hanlon, "*Jones v. Wolf*: Church Autonomy and the Religion Clauses of the First Amendment," 128 U.Pa.L.Rev. 1291 (1980).

"[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees."

*Id.* —— U.S. at ——, 102 S.Ct. at 1057.

Employees have been granted certain organizational rights by the Act. Those working for the Home should not be deprived of these benefits in the absence of circumstances that outweigh the employees' interests. The record establishes that the primary function of the Tressler Home is the same as that of its purely secular counterparts. The patients and staff are not restricted to one religious sect. The employees have no explicit religious supervision or direction in their work and no specific religious tenets proscribe compliance with the Act. Balancing such factors against the rights granted by the Act persuades us that the Home's First Amendment challenge must be denied.

The Court of Appeals for the Eighth Circuit in *NLRB v. St. Louis Christian Home,* 663 F.2d 60 (8th Cir. 1981), came to the same conclusion as do we in rejecting an attack on the Board's jurisdiction over a nursing home with religious connections. *See also NLRB v. World Evangelism, Inc.,* 656 F.2d 1349 (9th Cir. 1981); *Cap Santa Vue, supra. Cf. St. Elizabeth Community Hospital v. NLRB,* 626 F.2d 123 (9th Cir. 1980) (remand for fact finding on First Amendment issue).

■ Our ruling must not be misinterpreted however. Although as we said earlier, the Board may not rule on constitutional issues, in choosing to exercise its jurisdiction over institutions which have religious affiliations it must be aware that it is treading in areas where sensitivity to the important values of the First Amendment must be the rule, not the exception. The attitude that might be appropriate when regulating an employer that is a profit-making entity in an industrial setting is not necessarily permissible when the employer is a church-related institution which is being challenged for its religious practices.

■ Having found no valid First Amendment objections to the jurisdiction of the Board, we therefore must consider the contentions raised by the Home with respect to the election campaign. We have carefully considered the objections raised by the Home to the alleged misrepresentations, union literature, and verbal harassment by union sympathizers. While the vulgarity employed by some of the pro-union employees reflects no credit upon them, we cannot say that the Board abused its discretion in concluding that the objectionable material did not exceed the bounds of allowable campaigning. In considering the nature of the challenged campaign activity, the majority which the union attained in the election, and the investigation conducted by the Board, we conclude that a hearing on the objections was not required. *Cf. National Labor Relations Board v. ARA Services, Inc.,* 675 F.2d 83 (No. 81–1937, 3d Cir. Apr. 13, 1982), *Anchor Inns, Inc. v. NLRB,* 644 F.2d 292 (3d Cir. 1981).

■ Nor are we persuaded that the Board erred in including the licensed practical nurses within the bargaining unit. There is substantial evidence that they were not supervisory personnel. *See Beverly Enterprises v. NLRB,* 661 F.2d 1095, 1098–1101 (6th Cir. 1981). Moreover, we observe that inclusion of the LPNs serves to limit the proliferation of bargaining units which we cautioned against in *St. Vincent's Hospital v. NLRB,* 567 F.2d 588 (3d Cir. 1977), and *Allegheny General Hospital v. NLRB,* 608 F.2d 965 (3d Cir. 1979). The Board is given considerable discretion in shaping bargaining units, *Warner Co. v. NLRB,* 365 F.2d 435, 437 (3d Cir. 1966), and we see nothing here that would require us to interfere with that activity.

Accordingly, the petition of the employer will be denied and the Board's request for enforcement will be granted.